Reginald H. HOWE, Plaintiff, Appellant,

v.

GOLDCORP INVESTMENTS, LTD.,
et al., Defendants, Appellees.

No. 91–1132.

United States Court of Appeals,
First Circuit.

Heard June 4, 1991.

Decided Sept. 27, 1991.

As Modified Oct. 31, 1991.

Reginald H. Howe, pro se.

Joseph A. Franco, Sp. Counsel, with whom Thomas L. Riesenberg, Asst. General Counsel, Felicia H. Kung, Attorney, S.E.C., and Paul Gonson, Sol., were on brief, for S.E.C., amicus curiae.

Harvey J. Wolkoff with whom David A. Martland, Robyn D. Gold, Ropes & Gray, John A.D. Gilmore and Hill & Barlow were on brief, for Goldcorp and Dickenson, defendants, appellees.

Brackett B. Denniston, III, Barbara Gruenthal, Sam A. Wilkins, III, and Goodwin, Procter & Hoar on brief, for defendants, appellees Tory, Tory, DesLauriers & Binnington, Charles F. Scott and James E.A. Turner.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL,* District Judge.

BREYER, Chief Judge.

The doctrine of *forum non conveniens* permits an American court to decline to exercise jurisdiction over a case when a foreign tribunal can more appropriately conduct the litigation. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250, 102 S.Ct. 252, 263, 70 L.Ed.2d 419 (1981); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507–08, 67 S.Ct. 839, 842–43, 91 L.Ed. 1055 (1947). This appeal raises the important question of whether a federal court has the legal power to invoke the *forum non conveniens* doctrine in a private securities law action brought against a foreign company, its officers and other foreign defendants. The action rests upon conduct that took place primarily (but not entirely) outside the United States; the plaintiff alleges that this conduct violated several laws, including American securities laws forbidding misrepresentation. *See* 15 U.S.C. § 78j(b) (Exchange Act anti-fraud provision); 15 U.S.C. § 77q(a) (Securities Act anti-fraud provision).

We conclude that the federal courts possess the power to invoke the *forum non conveniens* doctrine in a private action claiming a violation of American anti-fraud securities statutes, as they do in cases brought under most other federal statutes. We hold that the case before us is an appropriate case in which to invoke the doctrine. And we conclude that the district court's dismissal of the case (in effect requiring the plaintiff to bring his case in Canada) was lawful.

## I

### Background

The plaintiff in this case, Reginald Howe, an American shareholder of Goldcorp, claims that defendants Goldcorp, its officers, its investment advisors, and its lawyers, all of whom are Canadians, violated securities statutes, primarily by failing to

disclose adequately their intentions, plans, objectives and other circumstances related to their efforts to take over two other Canadian companies called Dickenson and Kam–Kotia. He claims that, in these same circumstances, some of these defendants violated their fiduciary duties to Goldcorp or to its shareholders, and some, or all, of the defendants violated other statutes as well. The district court dismissed all of Mr. Howe's claims on grounds of *forum non conveniens*.

To understand the basis for our conclusion that the dismissal of the entire case was lawful, the reader must keep in mind background circumstances that involve complex relationships among three factors: (1) Goldcorp's contacts with the United States, (2) the basic circumstances out of which Mr. Howe's claims developed, and (3) Mr. Howe's several different, specific legal claims. We shall describe these matters briefly, drawing upon our reading of the complaint and its supporting affidavits. We shall also sometimes discuss the case as if it were against Goldcorp alone, when doing so simplifies our discussion. (When we do this, we believe our reasoning applies with equal or stronger force to Mr. Howe's claims against Goldcorp's officers and advisors.)

### A. Goldcorp's Contacts with the United States

The record indicates that Goldcorp's significant contacts with the United States are limited:

First, Goldcorp is a Canadian corporation. Its shares trade on Canadian stock exchanges where anyone can buy them. Goldcorp sells its shares to residents of the United States only if they (or their agents) buy those shares in Canada. Goldcorp shares do not trade on stock exchanges (nor are they sold over the counter) in the United States.

Second, Goldcorp sends annual reports, proxy statements and similar material to shareholders in whatever country they live. Thus, shareholders who live in the United

* Of the District of New Hampshire, sitting by designation.

States receive this material, sent as part of general, worldwide mailings.

Third, Goldcorp sends regular dividends to shareholders in whatever country they live. Shareholders who live in the United States receive dividend payments from Goldcorp, but only as part of a general distribution to all shareholders. Goldcorp, at least once, issued rights to all of its shareholders entitling them to buy additional Goldcorp shares (at a special price); but Goldcorp did *not* distribute those rights to shareholders in the United States. Rather, it sold in Canada the rights of its American shareholders and sent them the proceeds of the sale.

Fourth, Goldcorp employees have answered, by mail or by phone, specific questions addressed to them by Goldcorp's shareholders in the United States. Goldcorp employees have, from time to time, sent annual reports and similar written material to investment advisors or stock brokers in the United States, always at the request of those advisors or brokers, who themselves (or who have clients who) were already Goldcorp shareholders. On at least one occasion, Goldcorp explained to a broker in the United States (who had asked Goldcorp) how that broker could buy a large block of shares on a Canadian exchange.

Fifth, in 1989 Goldcorp acquired two Canadian companies (called Dickenson and Kam–Kotia) which owned some assets in the United States and had some American shareholders. In doing so, it had to comply—and did comply—with various United States Securities and Exchange Commission requirements.

Sixth, Goldcorp's American shareholders, including Mr. Howe, own about one-third of Goldcorp's shares.

### B. The Basic Underlying Circumstances

Mr. Howe's allegations grow out of the following events:

1. Before 1987 Goldcorp was a company that owned gold and held other diverse, gold-related investments. Its articles of incorporation forbid it to own more than 10 percent of the assets of any other single company or to invest more than 10 percent of its own assets in the shares of any other single company. Thus, investment in Goldcorp amounted to an investment approximately as safe as gold itself; for Goldcorp could itself own only (1) gold and (2) a small or diverse portfolio of other gold-related companies.

2. In 1987 Goldcorp asked its shareholders to approve changes in its articles of incorporation that would permit it to own more than 10 percent of other individual companies and to invest more than 10 percent of its own assets in a single company's shares. The stockholders gave their approval.

3. In January 1989 a Canadian company called Corona tried to take over two other Canadian goldmining companies (Dickenson and Kam–Kotia). Goldcorp, appearing (in Mr. Howe's words) as a "white knight," thwarted Corona's bid by taking over these two companies itself. Corona brought a lawsuit in Canada claiming that the Goldcorp takeover would violate a provision in Goldcorp's articles of incorporation (prohibiting Goldcorp from investing in a firm in which its financial advisors held more than a 5 percent interest), but Corona lost this lawsuit.

4. As a result of the takeovers of Dickenson and Kam–Kotia, the value of Goldcorp's shares declined dramatically.

### C. The Legal Claims

Mr. Howe's complaint claims that facts surrounding Goldcorp's amendment of its articles of incorporation in 1987 and its 1989 takeover of Dickenson and Kam–Kotia reveal several kinds of unlawful activity. First, he says that Goldcorp "defrauded" its shareholders, primarily by failing to explain adequately that the changes in its articles of incorporation meant a radical change in its investment policy. In particular, alleges Mr. Howe, Goldcorp failed to explain that the corporation would no long-

er invest its assets safely in gold and in a diversified portfolio, but, instead, would invest heavily in the shares of one or two companies, thereby greatly increasing the risks to investors in Goldcorp. This "misrepresentation" or "fraud," the complaint says, violates the federal securities laws, *see* 15 U.S.C. §§ 78j(b), 77q(a), Massachusetts consumer protection law, *see* Mass. Gen.L. ch. 93A, and the common law of fraud and misrepresentation.

Second, the complaint claims another instance of "misrepresentation" or "fraud." It states that Goldcorp failed to disclose to the SEC (as part of its 1989 effort to buy shares of Dickenson and Kam–Kotia from United States shareholders) the existence of legal problems surrounding the 1987 amendment of its articles of incorporation. *See* 15 U.S.C. § 78n.

Third, the complaint says that officers of Goldcorp and Goldcorp's investment managers, when organizing the takeover of Dickenson and Kam–Kotia, tried to help themselves rather than to benefit Goldcorp. It says, for example, that, by improperly looking to their own financial gain, they violated fiduciary duties owed to the company—duties imposed by common law, Canadian law, securities statutes and the American Investment Company Act of 1940.

Fourth, the complaint says that these same misrepresentations and violations of fiduciary duty violated various federal criminal statutes, such as the anti-racketeering laws. *See* 18 U.S.C. §§ 1341 *et seq.;* 18 U.S.C. §§ 1961 *et seq.*

Fifth, the complaint says that Goldcorp should have "registered" with the SEC, under the Investment Company Act. *See* 15 U.S.C. § 80a–7.

The complaint asks for damages and it asks the district court to order Goldcorp to "register" with the SEC.

The district court, following the recommendation of a magistrate, dismissed Mr. Howe's complaint on grounds of *forum non conveniens.* Mr. Howe appeals this dismissal.

II

*The Court's Legal Power to Invoke the Doctrine*

■ The doctrine of *forum non conveniens,* apparently originating in nineteenth century Scottish law, *see Alcoa Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147, 150 n. 3 (2d Cir.1980), permits a court to dismiss a case because the chosen forum (despite the presence of jurisdiction and venue) is so inconvenient that it would be unfair to conduct the litigation in that place. Dismissal has the practical effect of requiring the plaintiff to file his complaint in a more convenient forum elsewhere. The Supreme Court has held that the federal courts may invoke the doctrine. *Piper Aircraft,* 454 U.S. at 250, 102 S.Ct. at 263; *Gilbert,* 330 U.S. at 507–08, 67 S.Ct. at 842–43. The Court has stressed that the doctrine is "flexible," that its "contours" are not "rigid," and that, in applying it, courts are to take account of many "considerations" related to fairness and convenience. *See Piper Aircraft,* 454 U.S. at 249, 102 S.Ct. at 262. For example, can the plaintiff bring his suit almost as easily elsewhere? How inconvenient, how oppressive might it be to force the defendant to appear in the initially chosen forum? Is the relation between the chosen forum and the lawsuit so attenuated that conducting the case in the chosen forum seems an "imposition" on the court? *See Gilbert,* 330 U.S. at 507–08, 67 S.Ct. at 842–43.

Before 1948, when Congress enacted 28 U.S.C. § 1404(a) (permitting a "change of venue" between United States district courts for "the convenience of parties and witnesses"), federal courts invoked the doctrine of *forum non conveniens* to force transfer of a case domestically from one state or district to another. *See Gilbert,* 330 U.S. 501, 67 S.Ct. 839 (dismissing case brought in New York where Virginia was more convenient); 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3828 (2d ed. 1986). Since 1948, federal courts have relied on § 1404(a)'s *statutory* authority when transferring cases between domestic courts. They have had to use the

non-statutory *forum non conveniens* doctrine only to bring about an *international* transfer of a case (from the United States to a foreign state) where plaintiffs may bring approximately the same action in the foreign forum, but without the unfairness and inconvenience that trying the case in this country would entail. The district court has invoked the doctrine for that reason in this case.

■ Appellant, first and most importantly, argues that (notwithstanding *general* Supreme Court authority to the contrary, *e.g., Piper Aircraft, supra*) *special* legal circumstances here deprive the district court of the legal power to employ the *forum non conveniens* doctrine *at all.* Supported by the SEC's amicus brief, he says that, no matter what the circumstances, no matter what the unfairness, a federal court (with jurisdiction and proper venue) lacks the power to invoke *forum non conveniens* if Congress has passed an applicable *"special"* venue statute, a statute that broadens the plaintiff's choice of forum beyond the choices that federal law's "general" venue statute otherwise would provide. The SEC's argument is highly technical, but its essential elements are these:

Venue statutes specify the subset of all federal courts with jurisdiction in which a plaintiff may bring a particular claim. In 1933 and 1934, the *"general* venue" statute (applicable to all federal cases) permitted a plaintiff to bring a case where the defendant was an "inhabitant" (for federal question cases) or a "resident" (for diversity jurisdiction cases). *See* Act of March 3, 1887, ch. 373, 24 Stat. 552 (current version at 28 U.S.C. § 1391); 15 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3802. *Special* venue provisions in the Securities Acts, however, then said that a securities law plaintiff also could bring a securities action in a federal court (with jurisdiction) wherever the "offer or sale took place" (or, in the case of the 1934 Act, "wherein any act or transaction constituting the violation occurred"). The fact that Congress enacted these "special venue" provisions (says the SEC in its amicus

brief) means that Congress did not want the federal courts to apply the *forum non conveniens* doctrine at all; rather, Congress wanted to permit a plaintiff to bring a case *wherever* venue lay. *Cf. Gilbert,* 330 U.S. at 505, 67 S.Ct. at 841 (discussing applicability of *forum non conveniens* doctrine under Federal Employers' Liability Act and its "special venue provisions").

The SEC adds that in 1948 the Supreme Court held that a federal court in California could not transfer an antitrust case (via *forum non conveniens*) to a more convenient federal forum in Illinois. *United States v. National City Lines,* 334 U.S. 573, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948) (*"National City Lines I"*). The Court then said that Congress, in enacting a special venue statute in the antitrust laws, intended to give a plaintiff an *absolute* right to choose the forum; hence, the California court could not transfer the case, regardless of inconvenience or unfairness. This reasoning, says the SEC, applies here.

We do not find this argument convincing, for several reasons. First, the Court in *National City Lines I* relied heavily on the legislative history of the *antitrust* law's special venue statute. It found, in that history, especially strong reasons for believing Congress did not want to permit courts to transfer cases, irrespective of convenience. *National City Lines I,* 334 U.S. at 587, 68 S.Ct. at 1177, *citing* 51 Cong.Rec. 16274 (1914) (statement of Rep. Webb) ("we are liberalizing the procedure ... in order to give the individual who is damaged the right to get his damages anywhere—anywhere you can catch the offender...."); *id.* at 9417 (statement of Rep. Scott) ("I could not conceive that anything would deprive the plaintiff of his right to choose the place of trial if he so desired...."); *id.* at 9467 ("The amendment ... permits suit to be brought, *with absolute discretion on the part of the plaintiff,* in any district where the defendant may have an agent....") (emphasis added by the *National City Lines I* Court); *compare,* in respect to the Federal Employers' Liability Act, *Baltimore & Ohio R.R. v. Kepner,* 314 U.S. 44, 49, 62 S.Ct. 6, 8, 86 L.Ed. 28, *citing* S.Rep. No. 432, 61st Cong.,

2d Sess. 4 (1910) (remarks of Sen. Borah) (after "considering the deficiencies" of having left claims under the act subject to the general venue statute, Congress expanded venue with language that "must have been deliberately chosen to enable plaintiff ... to find the corporation at any point or place or state where it is actually carrying on business, and there to lodge his action, if he chooses to do so.") and *Miles v. Illinois*, 315 U.S. 698, 703, 62 S.Ct. 827, 830, 86 L.Ed. 1129 (1942) (provision Congress adopted was designed to give "plaintiff the right to select the forum....").

We have found no such unusual legislative history relevant to the Securities Acts' special venue statutes, however. And, we believe that difference is significant. After all, members of Congress enacting a special venue statute normally will not have thought about its potential effect upon transfers of cases to more convenient forums. *The language of such a statute does not forbid transfer.* It typically says nothing at all about case transfers. Its language simply adds to the number of courts *empowered* to hear a plaintiff's claim. As Justice Jackson pointed out in *Gulf Oil v. Gilbert*, "that the venue statutes of the United States ... empower [a] court to entertain [an action] does not settle the question whether [that court] must do so." 330 U.S. at 504, 67 S.Ct. at 841.

Indeed, in the international context one can ask, "What is so special about a special venue statute?" If a *general* venue statute opening federal court doors (say, in New York) is compatible with an international *forum non conveniens* transfer (say, to Italy), why does a special venue statute which simply opens another court's doors (say, in California) suddenly make the same international transfer unlawful? *Both* kinds of statutes open otherwise closed court doors. *Neither* kind of statute, explicitly or (absent some special legislative intent) implicitly, prohibits an international transfer. The distinction between "special" and "general" venue statutes is particularly difficult to maintain in light of congressional amendments to the "general" venue statute that have nearly erased

the distinction between special and general. *See* 28 U.S.C. § 1391 (defining residence for corporations to include any place where the corporation has sufficient contacts to support jurisdiction); 15 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3802.

Second, immediately after the Supreme Court decided *National City Lines I*, Congress enacted a new statute, 28 U.S.C. § 1404(a), that explicitly permitted domestic transfers of cases to more convenient forums. And, the very next year the Supreme Court simply *overruled National City Lines I. United States v. National City Lines*, 337 U.S. 78, 84, 69 S.Ct. 955, 958, 93 L.Ed. 1226 (1949) ("*National City Lines II*"). The SEC points out that § 1404(a) applies only to domestic, not international, transfers, and it argues that *National City Lines I* continues to govern—and prohibit—the latter. *Compare Industrial Invest. Dev. Corp. v. Mitsui & Co.*, 671 F.2d 876 (5th Cir.1982), *vacated*, 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983) (antitrust case accepting this kind of argument); and *Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1144 (5th Cir.1989), *cert. denied*, 493 U.S. 918, 110 S.Ct. 279, 107 L.Ed.2d 259 (1989) (*citing Mitsui*) with *Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127 (2d Cir.1987) (rejecting the argument). But, the Court in *National City Lines I* considered *only* domestic transfers; it did not consider international transfers at all.

Moreover, § 1404(a) at the least reflects a congressional policy strongly favoring transfers. This removes whatever temptation one otherwise might have to engage in the legal fiction that a different Congress, which never considered transfers at all and which wrote a venue statute that never mentioned them, somehow intended to take from the courts their long-established power to transfer a case when considerations of fairness and convenience so required. It is, therefore, not surprising that most case law in recent years has taken positions contrary to that which the SEC now urges upon us. *See Transunion Corp. v. Pepsico, Inc.*, 811 F.2d at 130 (*forum non conveniens* applicable in RICO cases notwith-

standing special venue provision); *In re Aircrash Disaster Near New Orleans*, 821 F.2d 1147, 1163–64 (5th Cir.1987) *(forum non conveniens* available under Jones Act notwithstanding special venue provision); *Cruz v. Maritime Co. of Philippines*, 702 F.2d 47, 47–48 (2d Cir.1983) (same); *accord Gazis v. John S. Latsis, Inc.*, 729 F.Supp. 979, 987–88 (S.D.N.Y.1990); *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 431 (9th Cir.1977) *(forum non conveniens* applicable to Lanham Act notwithstanding special venue provision); *but see Mitsui*, 671 F.2d at 890–91 (antitrust special venue provision leaves no room for discretionary *forum non conveniens* dismissal); *Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1483 (9th Cir.1987), *cert. denied*, 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988) (special venue provision of Jones Act bars *forum non conveniens* application); *SEC v. Wimer*, 75 F.Supp. 955, 963–65 (W.D.Pa.1948) (statement indicating that Securities Act special venue statute bars *forum non conveniens* dismissal); *Pioneer Properties, Inc. v. Martin*, 557 F.Supp. 1354, 1362 (D.Kan.1983), *appeal dismissed*, 776 F.2d 888 (10th Cir.1985) (somewhat similar language).

Third, we can find no good policy reason for reading the special venue provisions as if someone in Congress really intended them to remove the courts' legal power to invoke the doctrine of *forum non conveniens* in an otherwise appropriate case. The growing interdependence of formerly separate national economies, the increased extent to which commerce is international, and the greater likelihood that an act performed in one country will affect citizens of another, all argue for expanded efforts to help the world's legal systems work together, in harmony, rather than at cross purposes. To insist that American courts hear cases where the balance of convenience and the interests of justice require that they be brought elsewhere will simply encourage an international forum-shopping that would increase the likelihood that decisions made in one country will cause (through lack of awareness or understanding) adverse effects in another, eroding uniformity or thwarting the aims of law and policy. And, to deprive American courts of their transfer power when, but only when, one of more than three hundred special venue statutes applies, would create a hodge-podge, that would, or would not, bring about American adjudication of an essentially foreign controversy, depending upon the pure happenstance of whether Congress—at some perhaps distant period and likely out of a desire to widen plaintiffs' venue choices in typical domestic cases—enacted a "special venue" provision. *See* 15 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3804 at 28 n. 2 (citing ALI study listing some 330 venue provisions in sections of the United States Code not in Title 28). Such a result would seem thoroughly unsound.

For these reasons, we reject the SEC's argument that the courts *never* have power to dismiss a private securities law case on *forum non conveniens* grounds.

## III

### *The Doctrine Applied*

 We turn now to the appellant's second argument, also supported by the SEC—that the district court misapplied the doctrine of *forum non conveniens* in the present case. We consider this argument in light of several well-established legal principles. First, *forum non conveniens* is a flexible, practical doctrine designed to avoid trials in places so "inconvenient" that transfer is needed to avoid serious unfairness. *Piper Aircraft*, 454 U.S. at 259, 102 S.Ct. at 267; *cf. Gilbert*, 330 U.S. at 507, 67 S.Ct. at 842 (inconvenience must be serious to warrant transfer from plaintiff's chosen forum; plaintiff's choice of forum is to be disturbed only "rarely").

Second, although *forum non conveniens* is not "rigid," *Piper Aircraft*, 454 U.S. at 249, 102 S.Ct. at 262, and "[e]ach case turns on its facts," *id.* (quoting *Williams v. Green Bay & Western R.R.*, 326 U.S. 549, 557, 66 S.Ct. 284, 288, 90 L.Ed. 311 (1946), the Supreme Court has provided an illustrative list of relevant considerations: "Private interest" factors include "relative ease

of access to sources of proof; availability of compulsory process;" comparative trial costs, ability to enforce a judgment, and so forth. "Public interest" factors include the practical difficulties of unnecessarily imposing upon a busy court (or citizens called to jury duty) the obligation to hear a case more fairly adjudicated elsewhere, as well as having a judge more familiar with relevant law make the requisite legal determinations. *See, e.g., Gilbert,* 330 U.S. at 508–09, 67 S.Ct. at 843 (upholding decision to dismiss a negligence case brought in New York, because Virginia, where plaintiff lived, where the accident occurred, and where many witnesses and most of the evidence would be found, was a more convenient forum).

Third, the *"forum non conveniens* determination is committed to the sound discretion of the trial court. It may be reversed only where there has been a clear abuse of discretion: where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Piper Aircraft,* 454 U.S. at 257, 102 S.Ct. at 266 (upholding district court's dismissal of products liability suit, for reasons of convenience of trial, requiring transfer of the case from Pennsylvania to Scotland despite the presence of Pennsylvania defendants and the likelihood that Scottish law was less favorable to plaintiffs); *cf. Mercier v. Sheraton Int'l Inc.,* 935 F.2d 419, 423, 430 (1st Cir.1991) (reversing, for "abuse of discretion," district court dismissal on *forum non conveniens* grounds where district court erred in assessing key public interest factors and in finding foreign forum adequate).

We can find no "clear abuse" of the district court's powers in this case. For one thing, the balance of conveniences seems to favor, with unusual strength, the Canadian defendants. The relevant events surrounding both plaintiff's "misrepresentation" and "breach of fiduciary duty" claims took place *in Canada,* not in the United States. The Canadian directors of Goldcorp, its officers, its investment advis-

ors, and its lawyers, meeting, speaking, planning, and acting *in Canada,* took (or failed to take) the actions that allegedly amounted to a failure to remain properly loyal to Goldcorp and its shareholders. Canadian individuals also decided, *in Canada,* precisely what statements they or the corporation should make, or should not make, in public descriptions of changes in Goldcorp's articles of incorporation, of changes in Goldcorp's investment policies, and of circumstances surrounding the takeover of Dickenson and Kam–Kotia. They presumably arranged to have printed *in Canada* most of the documents embodying most of those statements (though they then disseminated many of these documents to shareholders throughout the world). Thus, the relevant actions, statements and omissions that underlie the plaintiff's claims of "misrepresentation" or "fraud" originated in Canada. Most of the background facts that might show those statements or omissions to be materially false or misleading occurred in Canada.

Given these facts, it is not surprising that most of the evidence is in Canada and most of the witnesses are in Canada. Indeed, an undisputed affidavit by Goldcorp's President says that, except for Mr. Howe, no resident of the United States "has knowledge relevant to the matters alleged in the amended complaint." And, only Canadian courts, not courts within the United States, have the legal power to compel the testimony of twelve Canadian potential witnesses who are not under the control of any party. *Cf. Pain v. United Technologies Corp.,* 637 F.2d 775, 786–88 (D.C.Cir. 1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981) (where most of the documents and testimonial evidence were outside the United States and were "immune from the compulsory process of American courts," if "trial were to be conducted in the United States, the inability of both parties to obtain the full panoply of relevant ... evidence would greatly hinder fair resolution of the dispute"); *Dahl v. United Technologies Corp.,* 632 F.2d 1027, 1030 (3d Cir.1980) (same); *Schertenleib v. Traum,* 589 F.2d 1156, 1165 (2d Cir.1978) ("inability to bring [witnesses] here for live

cross examination before a fact-finder" is "[p]erhaps the most significant problem" making adjudication in a United States court inappropriate); *Farmanfarmaian v. Gulf Oil Corp.*, 588 F.2d 880, 881 (2d Cir. 1978) (quoting district court opinion, that "evidence of the breach ... [and] major witnesses ... [will] most likely come from" a foreign country "weigh[s] heavily" in favor of declining jurisdiction on *forum non conveniens* grounds); *see also Piper Aircraft*, 454 U.S. at 258, 102 S.Ct. at 267; *De Melo v. Lederle Laboratories, Div. of American Cyanamid Corp.*, 801 F.2d 1058, 1063 (8th Cir.1986) ("It is of considerable importance ... that litigation in the United States would deprive Lederle of compulsory process....").

Compulsory process would seem especially important where, as here, fraud and subjective intent are elements of the claim, making the live testimony of witnesses for the purposes of presenting demeanor evidence essential to a fair trial. *See Schertenleib*, 589 F.2d at 1165 ("Since the crux of this litigation is the truth or falsity of ... charges that plaintiff is a swindler, to be able to take the alleged co-conspirators' testimony by letter rogatory only would be a very serious hardship"); *Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 510 n. 10 (S.D.N.Y.1982) (in a fraud action, availability of compulsory process in alternative forum is a factor favoring dismissal for *forum non conveniens* ).

At the same time, trial in Canada will not deprive the plaintiff of relevant legal advantages. Canadian courts will either apply American law, *see* Restatement (Second) of Conflict of Laws § 6; *Canada Malting Co. v. Paterson Steamship, Ltd.*, 285 U.S. 413, 424, 52 S.Ct. 413, 416, 76 L.Ed. 837 (1932); or they will apply Canadian laws that offer shareholders somewhat similar protections by forbidding misrepresentation and fraud and imposing fiduciary obligations. *See* Securities Act, R.S.O.1980, ch. 466, §§ 126–27 (liability for misrepresentation in offering or circular); *id.* §§ 131–32 (liability for nondisclosure of material fact or change, for tipping, for insider trading); Business Corporations Act, S.O.1982, ch. 4, §§ 134, 244–47 & 252 (director and officer standard of care; shareholders' remedies); Anisman Aff. at 10–11, 14–18.

We concede there may be some differences between Canadian and American law on these matters. Controlling precedent makes clear, however, that small differences in standards and procedural differences (such as greater difficulty in meeting class action requirements or less generous rules for recovering attorney's fees) are beside the point. *Piper Aircraft*, 454 U.S. at 254, 252 n. 18, 102 S.Ct. at 265, 264 n. 18 (the "possibility of an unfavorable change in law" is not even "relevant" unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all"). *See Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d at 1145 (absence of equivalent of RICO in foreign jurisdiction does not bar dismissal on grounds of *forum non conveniens* where foreign law permits recovery for fraud, negligence, breach of fiduciary duty and the like); *Dowling v. Richardson–Merrell, Inc.*, 727 F.2d 608, 615 (6th Cir.1984) (that "certain theories of tort recovery are not recognized" in the foreign jurisdiction does not make the "remedy provided by the alternative forum ... clearly inadequate or unsatisfactory"); *Alcoa Steamship*, 654 F.2d at 159 (maximum recovery of $570,000 in foreign forum versus $8,000,000 in United States does not render foreign forum inadequate); *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 453 (2d Cir.1975) *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976) (court has discretion to dismiss "even though the law applicable in the alternative forum may be less favorable to the plaintiff's chance of recovery"); *Fustok*, 546 F.Supp. at 513–14 ("even if the Swiss courts apply Swiss law rather than the Commodity Exchange Act, plaintiff is deprived of no right.... There can be no doubt that the allegations of fraud which are basic to plaintiff's claims are actionable under Swiss law").

Further, this case, except for the presence of an American shareholder, has little

to do with Massachusetts or any other jurisdiction in the United States. Goldcorp's contacts with the United States consist of those listed earlier: (1) sending reports and statements to American shareholders among others, (2) answering questions sent by Americans about, how, for example, they might buy shares in Canada, (3) providing explanations of corporate policies and activities to American shareholders, such as Mr. Howe, who requested them, and (4) filing takeover information with the SEC so that Goldcorp could buy shares that Americans might hold in two Canadian companies (Dickenson and Kam–Kotia). In respect to Massachusetts, Goldcorp's activities apparently come down to keeping a mailing list of eight shareholders, sending those shareholders ordinary information, and answering requests for information from one firm of investment advisors (Shearson Lehman, to which Goldcorp sent ten annual, and ten interim, reports) and seven individuals.

Finally, this case has a great deal to do with Canada. The underlying circumstances involve actions of a Canadian corporation, its directors, officers and advisors. And the plaintiff's claims implicate duties the defendants owed to the corporation and its shareholders under Canadian law. Thus, at least some significant portion of the adjudication of Mr. Howe's case will involve tasks most easily and appropriately handled by a Canadian court: interpreting primarily Canadian law and applying it to matters principally of concern to Canada and Canadians. *See Piper Aircraft*, 454 U.S. at 260–61, 102 S.Ct. at 268–69 (possibility that American court would have to apply Scottish law, and strong Scottish "local" interest in litigation over an aircrash in Scotland were among factors favoring *forum non conveniens* dismissal, and were not outweighed by loss of "incremental deterrence" due to elimination of one theory of recovery which trial in Scotland would entail).

Of course, as we said, Goldcorp has a significant number of American shareholders; Mr. Howe claims to represent a class of 2,500 American shareholders; and federal securities laws are designed to protect American investors from misrepresentation and fraud. But, neither Mr. Howe nor the SEC has provided us with any reason to believe those laws seek so strongly to protect Americans who bought their shares *abroad* from misrepresentations (or violations of fiduciary duty) primarily taking place *abroad* that a court may not require an American shareholder to bring his case abroad in a nation that offers its shareholders roughly equivalent legal protections. To hold the contrary here would, in effect, remove the court's *forum non conveniens* power in securities cases, raising the practical concerns we mentioned earlier. That is to say, we believe that a holding barring transfer would increase the risk that national legal systems will work to frustrate one another and would hinder efforts to promote greater coordination and harmony among them. *See* p. 950, *supra*.

In sum, in respect to Mr. Howe's basic claims involving misrepresentation and violations of fiduciary duties, these factors substantially outweigh Mr. Howe's suggestion in his affidavit (¶¶ 140–141) that he would find it financially difficult to litigate in Canada. We cannot say that the district court was clearly wrong in finding that the balance of conveniences favors suit in Canada and that litigation in Mr. Howe's chosen forum would likely prove both unfair and oppressive.

## IV

### *The Investment Company Act Claim*

■ Lastly, we turn to a different claim in Mr. Howe's complaint, an Investment Company Act claim. Mr. Howe says that, in respect to this claim, Canada offers him no similar legal protection and that the district court, therefore, should have permitted him to proceed on this claim in Massachusetts.

Mr. Howe's complaint says, in relevant part, that Goldcorp violated a provision of the Investment Company Act of 1940, which forbids a *foreign* investment company to

use ... the mails ... directly or indirectly, to offer for sale, sell or deliver after

sale, in connection with a public offering, any security of which the company is the issuer. (15 U.S.C. § 80a–7(d))

The Act qualifies this apparently absolute ban against foreign companies' publicly offering their shares for sale in the United States by authorizing the SEC to permit such sales under certain conditions. The Act says,

> Notwithstanding the provisions of this subsection ..., the Commission is authorized, upon application by [a foreign] investment company ...; to issue a conditional or unconditional order permitting such company to register under this title and to make a public offering of its securities by use of the mails ... if the Commission finds that ... it is both legally and practically feasible effectively to enforce the provisions of this subchapter [imposing special obligations such as registering the securities it issues, maintaining adequate financial records, and fulfilling fiduciary duties] against such company and that the issuance of such order is otherwise consistent with the public interest and protection of investors. (*Id.*)

Mr. Howe complains that, because Goldcorp did not "register," it violated the Act. He seeks both damages and a court order requiring Goldcorp to "register" with the SEC.

We believe, however, that the district court could properly dismiss this claim along with the others, for we do not see how the Act could entitle Mr. Howe to any relief beyond that which he would obtain simply by prevailing on the other claims in his complaint. Mr. Howe asks for damages, but how could violation of this particular section of the Act (dealing with registration) have damaged him? One can imagine a far-fetched theory, namely (1) that the Act required Goldcorp to register; (2) that, had Goldcorp registered, the SEC (or perhaps buyers) would have found it easier to force the corporation to comply with "fiduciary duty" obligations (and structural obligations designed to secure fulfillment of fiduciary duties) which the Act imposes; and (3) that Goldcorp's failure to comply with those substantive provisions enabled its officers and others to betray the corporation and its shareholders. But, damages on such a theory would require Mr. Howe to show that some of the defendants violated fiduciary duty obligations; and a showing of violation of fiduciary duty obligations would entitle Mr. Howe to damages in Canada on the basis of other theories in the complaint. As we have said, whether or not Canada's substantive law in respect to fiduciary duty is identical to American law is, under well-established, controlling legal authority, beside the point. *See* p. 952, *supra. Cf.* Business Corporations Act, S.O.1982, ch. 4 §§ 134, 247, 252 (provisions, in Canadian statutes, similar to the Investment Company Act of 1940); 15 U.S.C. § 80a–35. We are not surprised that, at oral argument, Mr. Howe very honestly said that the addition of his Investment Company Act claims did not "in substance" make a significant difference, for, in respect to damages, it seems but a longer and more tortuous road leading to the same Rome.

Mr. Howe's complaint also seeks a court order compelling Goldcorp to register under the Investment Company Act. We do not understand, however, how the law could entitle him to this relief. Assuming, purely for the sake of argument, that the Investment Company Act somehow applies to Goldcorp at all and, assuming further, that a court could grant injunctive relief under the Act at a private plaintiff's request, *but see Krome v. Merrill Lynch & Co., Inc.,* 637 F.Supp. 910, 918 (S.D.N.Y.1986) (private Investment Act plaintiff cannot obtain injunctive relief); *M.J. Whitman & Co. Pension Plan v. American Financial Enterprises, Inc.,* 552 F.Supp. 17, 22 (S.D.Ohio 1982), *aff'd,* 725 F.2d 394 (6th Cir.1984) (same), an order requiring registration could not constitute proper relief here. The Act does not compel *registration.* Rather, the Act *forbids* a *public offering* without (1) registration *and* (2) SEC approval. An order compelling registration alone would not normally bring a firm into compliance with the Act. To achieve compliance with these particular provisions of the Act, a court would nor-

mally have to enjoin a public offering, until the offeror both registered and received SEC approval.

Indeed, the relevant provisions of the Investment Company Act focus directly upon an investment company's "public offerings." Once one understands this, the statutory provisions on which Mr. Howe relies seem to have next to nothing to do with this case. Mr. Howe's complaint not only does not ask for an injunction forbidding a "public offering"; it does not even claim that Goldcorp ever made or intended to make a "public offering" in the United States. The SEC has suggested that we might permit Mr. Howe to amend his complaint in this respect. But we have not found anywhere in the voluminous documents before us any alleged facts that make it seem likely Mr. Howe could prove the existence of a "public offering." *See* Santa Barbara Securities, SEC No–Action Letter, Ref. No. 82–350–CC (Apr. 8, 1983) (describing SEC's "general" interpretation of the term "public offering" in § 3(c)(1) of the Investment Company Act as consistent with the term's meaning in § 4(2) of the 1933 Act); *United States v. Naftalin,* 441 U.S. 768, 777–78, 99 S.Ct. 2077, 2083–84, 60 L.Ed.2d 624 (1979) (excluding, from the definition of "public offering" in the 1933 Act, activities in connection with "redistributions" and sales in "aftermarkets"). Consequently, we do not believe it practical or fair to insist that the separate claim proceed in the Massachusetts court. To allow Mr. Howe to use this claim as a basis for keeping his entire case in Massachusetts would permit a very small, and defective, tail to wag a very large dog.

All this is to say that, in respect to the Investment Company Act claim, we do not see how the complaint could entitle Mr. Howe to the relief he seeks, nor do we see any significant practical likelihood that amending the complaint would make a difference. Hence, the presence in the complaint of the Investment Company Act claim does not compel reversal of the district court's dismissal.

In sum, reading Mr. Howe's complaint as strongly in his favor as the record permits, we find that the district court acted lawfully when it dismissed his claims against all the defendants in this case on the grounds of *forum non conveniens.* Since the ultimate judgment in this case is dismissal, we need not consider other arguments, made by individual defendants, that the law requires dismissal for other reasons as well, such as lack of personal jurisdiction.

The judgment of the district court is

*Affirmed.*