# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 06-1596

Pedro P. Del Rosario, Appellant,

v.

James B. Peake, M.D.,
Secretary of Veterans Affairs, Appellee.

On Appeal from the Board of Veterans' Appeals

(Decided January 5, 2009)

*Mark R. Lippman*, of La Jolla, California, was on the brief for the appellant.

*R. Randall Campbell*, Assistant General Counsel; *Carolyn F. Washington*, Deputy Assistant General Counsel; and *Kristen D. King-Holland*, all of Washington, D.C., were on the brief for the appellee.

Before GREENE, *Chief Judge*, and MOORMAN, and LANCE, *Judges*.

LANCE, *Judge*: The appellant, veteran Pedro P. Del Rosario, appeals through counsel a May 15, 2006, decision of the Board of Veterans' Appeals (Board) determining that forfeiture of his benefits pursuant to 38 U.S.C. § 6103(a) was proper. Record (R.) at 1-15. For the reasons that follow, the Court will affirm the Board's May 15, 2006, decision.

## I. FACTS

The appellant served in the U.S. Navy from October 1954 to March 1974. R. at 17-20. He was granted service connection for disabilities including coronary artery disease, chronic cystitis and prostatitis, diabetes mellitus, post-concussion syndrome, lichen simplex chronicus, hypothyroidism, peptic ulcer disease, and hemorrhoids. R. at 144. His combined disability rating was 90%, effective May 30, 2002. *Id.*

In September 1997, the regional office (RO) requested that a field examination be conducted to "investigate if [the appellant was] involved in claims fixing." R. at 49. The request indicated that

the appellant's "application as veteran's representative was denied by the Central Office" and that when confronted with that information, "he started presenting himself as the [s]ervice [o]fficer of a Retiree Affairs Office [(RAO)] in Manila. . . . [V]erification shows that there is no approved RAO, in Manila; although there[ i]s a rumor that an application for recognition is pending." *Id.* VA recorded 11 instances where the appellant followed up on claims for individuals. *Id.* A January 1998 field examination report reflects that "[w]itnesses interviewed were unanimous in their testimonies that they were assisted by the [appellant] for free." R. at 40. The appellant testified that he would assist claimants with "[c]o[u]nseling, preparation of claims including the collection of evidence, military records and other pertinent records," but that he did not have any written agreement with the claimants and did not charge them anything for his services. R. at 42-43. In an April 2002 sworn statement before a special agent of the VA Office of the Inspector General, the appellant stated: "In my spare time I help veterans in applying for VA benefits only when they come to me for assistance." R. at 57. He further stated:

> I have taken 10% of the VA lump sum payment received by the claimant only if they are willing to pay me. . . . I have taken the [illegible] 10% from 20 to 30 claimants. They were willing to give it to me. Over a 5 year period I have received approximately $5,000 for these services.

R. at 58.

An August 2002 field examination report reflects that veteran F.A. was interviewed to verify if he had signed an August 8, 2000, affidavit. R. at 64–72. The investigation centered on false affidavits signed by F.A., and allegedly prepared by the appellant, that were submitted on behalf of D.S. (surviving spouse of veteran Dn. S.) and Z.M.A. (surviving spouse of J.R.A.) in connection with their claims for dependency and indemnity compensation (DIC). R. at 60-84. In an August 8, 2000, affidavit (D.S. affidavit), F.A. stated that he had known veteran Dn. S. during his incarceration as a prisoner of war (POW) at Camp O' Donnel, Capas, Tarlac, and that he "had seen and observed that [Dn. S.] was afflicted with malaria, dysentery, beriberi, peptic ulcer and other ailments . . . ." R. at 51. Similarly, in an August 15, 2001, affidavit (Z.M.A. affidavit) F.A. stated that he had personally known veteran J.R.A. during his incarceration at Camp O'Donnel and that he "had seen and observed that [J.R.A.] was afflicted with [m]alaria, [d]ysentery, [b]eriberi, [p]eptic [u]lcer and [o]ther ailments . . . ." R. at 53. Except for differences in the deceased veterans' names and the dates

in which F.A. alleged he was detained in the POW camp with them, the affidavits are indistinguishable regarding the information provided about the deceased veterans. *Compare* R. at 51, *with* R. at 53.

The August 2002 field examination report further indicates that F.A. testified that he did "not know of any person by the name [Dn. S]." R. at 64 (summarizing deposition, R. at 66-72). The investigator related that F.A. also stated that "[Dn. S. was] not among those incarcerated with him at Camp O'Donnel." *Id.* The report also states:

> When shown the [a]ffidavit submitted by [D.S], [F.A.] stated that he could not read the affidavit because of very blurred vision. He explained that he is being assisted in the prosecution of his claim by Mr. Pedro Del Rosario. . . . He agreed to pay a minimum of 10% of any additional benefit he will be able to get from the VA. He recalled going to Mr. Del Rosario's office . . . where he signed documents pertaining only to his claim. He clarified that the contents of the documents were read and explained by Mr. Del Rosario before he affixed his signature. He insisted that he never signed any [a]ffidavit pertaining to the claim of another person.

*Id.*

F.A. was the subject of another field examination conducted in November 2002 in relation to the Z.M.A. affidavit. R. at 75-78. F.A testified that he did not remember the name of veteran J.R.A. nor that he was incarcerated at Camp O'Donnel. R. at 75. When he was shown the Z.M.A. affidavit, F.A. acknowledged his signature but stated that he did not know of its entire contents. R. at 76. When asked "[w]ho in the first place enticed [him] to sign the affidavit testifying that [veteran J.R.A.] was [his] former comrade at [Camp O'Donnel]," he replied: "Pedro Del Rosario, a veteran from Gen. Santos City." *Id.* F.A. stated that he did not receive remuneration for signing the affidavit and that the affidavit was not read or explained to him before it was signed. He further stated that he had payed the appellant 7,000 pesos for assisting him with his claim before VA and that he was being charged less "since [they] were cooperating with each other with regard[] to [the] claims of other veteran[s]. I referred to him other veteran[s] for his assistance." *Id.* He indicated that the appellant usually charged "20% of the lump sum" to other claimants. *Id.* F.A. further acknowledged signing other affidavits on behalf of other claimants upon request by the appellant, but that he did not usually know of their contents. *Id.*

Also in November 2002, D.S. was interviewed about the D.S. affidavit. R. at 61-63. During the interview, she stated:

> I would like to withdraw my [DIC] claim . . . in as much that I felt the affidavit submitted signed by certain [F.A.] was baseless. I have no proof or document to submit to prove that [F.A.] and my husband had ever met in the prison camp. It was my intention to have [the] benefit from your office[,] but I did not know, exactly the evidence[] submitted and I suppose[] being prepared by Del Rosario. . . . I am sorry I gave unfounded information which Mr. Pedro [D]el Rosario prepared.

R. at 61. When asked whether the appellant charged her for his assistance preparing the affidavit, she replied that "[h]e did not ask for money but he warned that should our claim [be] approved he would get money at our volition." R. at 62.

Subsequently, in April 2003, Z.M.A. was interviewed regarding her involvement with the Z.M.A. affidavit. R. at 82-84. The field examination report states that Z.M.A. "averred that [F.A.] was introduced to her by Mr. Pedro [D]el Rosario, who assisted her in her claim with the VA. She paid Mr. Del Rosario 1,000.00 pesos for the preparation of the affidavit, and he demanded 20% of the lump sum amount [s]he would be receiving from the VA." R. at 80. During the interview, Z.M.A. reported that the appellant told her that she was entitled to VA benefits as the surviving spouse of a deceased veteran and that "he was aware that [F.A.] and the veteran met each other at Camp O'Donnel, and he ([F.A.]) could help me in my claim with [VA] by executing an affidavit pertaining to his observation o[f] the veteran's physical condition at the time of his detention at the camp." R. at 82. She also indicated that VA awarded her a lump sum of $12,905, but that she was unable to pay the appellant because she "could not contact him at the PVAO [(Philippine Veterans Affairs Office)]." R. at 83. A December 2005 certification from the chief administrator of the PVAO states that the appellant "had never been connected in any capacity with the [PVAO]." R. at 287.

In a June 2003 letter from the RO, the appellant was notified of the RO's proposal to initiate forfeiture action under 38 U.S.C. § 6103. R. at 90-100. The letter notified him of the bases of the charge and of the pertinent statutory provisions governing forfeiture for fraud. R. at 90-92. Further, the appellant was informed:

> You have a right to a hearing within the 60-day period [from the date of the letter], with representation by counsel, if desired. Such hearings are for the purpose of

receiving contentions, oral arguments, and testimony and may be held before the Director, Compensation and Pension Service [(C&P)], Washington, D.C., or before qualified personnel of [VARO], Manila. Expenses incurred by you, your counsel, or your witnesses incident to attendance at a hearing will not be paid by the United States Government. If you do not desire to incur the expense of a hearing but prefer to mail us your written statement together with any other evidence, the written evidence will be given equal weight to that presented in a hearing. If you desire a hearing you may make arrangements by writing to this office and you will be advised of a date and time to report.

R. at 92.

On August 13, 2003, the appellant provided a written response to the charge. He asserted that he did not knowingly participate in the preparation and submission of fraudulent affidavits. R. at 105-108. He stated that he repeatedly pointed out to F.A. that if the facts in the affidavits were false, he did not have to sign them, as there would be consequences if he were to do so. R. at 105-06. To support his argument that he did not knowingly prepare the fraudulent affidavits, he submitted, inter alia, a July 10, 2003, affidavit signed by F.A. R. at 109. In that affidavit, F.A. averred that there had been no fraud in the execution of the D.S. affidavit as it was difficult for him to remember all of the people he had met during his incarceration at the POW camp. R. at 109, 114. He also stated that the appellant reminded him of the consequences of submitting untruthful statements to VA. R. at 109.

In August 2004, the RO issued a final administrative decision concluding that the evidence of record was "sufficient to warrant submission of the veteran for consideration of forfeiture for fraud." R. at 113. Thereafter, the Director of C&P determined that the appellant had forfeited his VA benefits because he had "knowingly and intentionally furnished false and fraudulent evidence in the prosecution of the surviving spouses' claims for VA benefits." 143-161. The appellant appealed to the Board (R. at 169-77, 202, 290), and on May 15, 2006, the Board issued the decision here on appeal. R. at 1-15. The Board determined that forfeiture was proper. R. at 1-13. The Board found that the evidence established that the appellant "knowingly assisted in the procurement, preparation, and/or presentation of fraudulent evidence (affidavits signed in August 2000 and August 2001) in connection with the pursuit of [DIC] on behalf of two surviving spouses who were not entitled to such benefits." R. at 12.

5

## II.  ANALYSIS

Section 6103(a) of title 38, U.S. Code, provides:

> Whoever knowingly makes or causes to be made or conspires, combines, aids, or assists in, agrees to, arranges for, or in any way procures the making or presentation of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, concerning any claim for benefits under any of the laws administered by the Secretary (except laws pertaining to insurance benefits) shall forfeit all rights, claims, and benefits under all laws administered by the Secretary (except laws pertaining to insurance benefits).

38 U.S.C. § 6103(a).  "Fraud" is defined by VA regulation as "[a]n act committed when a person knowingly makes or causes to be made[, among other things,] . . . a false or fraudulent affidavit . . . concerning any claim for benefits under any of the laws administered by [VA]."  38 C.F.R. § 3.901(a) (2008).  In *Trilles v. West*, 13 Vet.App. 314, 322 (2000) (en banc), the Court noted that "section 6103(d)(1) authorizes forfeiture actions for acts occurring in the Philippine Islands after July 4, 1946, the date of Philippine independence from its previous status as a territory of the United States." *See also* 38 U.S.C. § 6103(d)(1).

The Court in *Trilles* also noted that "[t]he language of section 6103 . . . is completely silent on the forfeiture process."  13 Vet.App. at 321.  The Secretary, however, has been delegated the authority "to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by [VA] and are consistent with those laws."  38 U.S.C. § 501(a).  For forfeiture cases, "the Secretary delegated authority to the director of C&P. . . 'to determine whether a claimant or payee has forfeited the right to gratuitous benefits or to remit a prior forfeiture pursuant to the provisions of 38 U.S.C. § 6103 or 6104.'"  *Flores v. Nicholson*, 19 Vet.App. 516, 520 (2005) (quoting 38 C.F.R. § 3.100 (2005)); *see* 38 C.F.R. § 3.100 (2008).  Further,

> [w]ith regard to adjudication of forfeiture cases arising in the Philippines, where prosecution under the U.S. criminal code and attendant procedural rights for the accused could not be relied upon, the Secretary implemented the adjudication procedures set forth in 38 C.F.R. § 3.905 . . . and supplemented by Chapter 36 of VA's Adjudication Procedure Manual M21-1, part IV [hereinafter M21-1]. *See Trilles*, 13 Vet.App. at 318.  Under these provisions, the Manila RO is authorized to conduct a preliminary adjudication of the alleged forfeiture. *See* 38 C.F.R. § 3.905(a).  If the RO concludes that the evidence establishes forfeiture, the RO forwards the matter to the director of C&P Service, VA Central Office for a final determination. *See id.*

6

*Flores*, 19 Vet.App. at 520.

A forfeiture action "must be declared 'beyond a reasonable doubt.'" *Trilles*, 13 Vet.App. at 326. The Board's determinations regarding forfeiture are reviewed under the "clearly erroneous" standard of review. *Flores*, 19 Vet.App. at 523.

## A. Due Process

### 1. Sufficiency of June 2003 Notice

The appellant first argues that the RO's June 2003 notice letter violated his due process rights because it provided him with "terse" notice and failed to inform him "of the importance of presenting live testimony at a hearing."[1] Appellant's Brief (Br.) at 7-12. Therefore, he contends that he did not knowingly and intelligently waive his right to a hearing. *Id.* at 7. The Secretary maintains that the notice provided adhered closely to the specific regulatory notice provisions under 38 C.F.R. § 3.905(b) for forfeiture of VA benefits under § 3.901 or § 3.902. Secretary's Br. at 10-11.

VA regulations explicitly set out in detail the notice requirements incident to a forfeiture proceeding. *See* 38 C.F.R. § 3.905(b) (2008); *see also* M21-1, ch. 36, pt. IV. Specifically, a forfeiture of benefits based on fraud "will not be declared until the person has been notified by the Regional Counsel or, in VA Regional Office, Manila, Philippines, the Veterans Service Center Manger, of the right to present a defense." 38 C.F.R. § 3.905(b). The notice must contain:

> (1) The specific charges against the person;
> (2) A detailed statement of the evidence supporting the charges, subject to regulatory limitations on disclosure of information;
> (3) Citations and discussion of the applicable statute;
> (4) The right to submit a statement or evidence within 60 days, either to rebut the charges or to explain the person's position;
> (5) The right to a hearing within 60 days, with representation by counsel of the person's own choosing, that fees for the representation are limited in accordance with 38 U.S.C. [§] 5904(c) and that no expenses incurred by a claimant, counsel or witness will be paid by VA.

---

[1] The appellant has not presented any argument with regard to the Board's ultimate determination that, beyond a reasonable doubt, he forfeited his right to VA benefits. Therefore, the Court will not address that issue in its decision. *Cromer v. Nicholson*, 19 Vet.App. 215, 217 (2005) ("[I]ssues not raised on appeal are considered abandoned.").

38 C.F.R. § 3.905(b). It is clear from the plain language of the regulation that VA unequivocally provides the opportunity for a hearing prior to the forfeiture of benefits. 38 C.F.R. § 3.905(b); *see* 38 C.F.R. § 3.103(b)(2) (2008) ("Advance notice and opportunity for hearing").

At the outset, the Court disagrees with the appellant's characterization of the notice provided by VA as "terse." Contrary to his description, the notice was detailed and informed him that he had 60 days within which to request a hearing, with representation. R. at 92. Additionally, the letter specifically informed him that the purpose of the hearing was for "receiving contentions, oral arguments, and testimony." *Id.* The letter also stated that he could mail a written statement together with any other evidence and that "the written evidence will be given equal weight to that presented in a hearing." *Id.* Further, it informed him that "[i]f [he] desire[d] a hearing [he could] make arrangements by writing [the RO] and [that he would] be advised of a date and time to report." *Id.* Finally, the letter notified the appellant that, "if no word [was] received from [him] within 60 days from the date of [the] letter, consideration [would] be made based on the evidence of record." *Id.*

It is well established that the essential requirements of due process are notice and the opportunity to respond. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *see also Edwards v. Peake*, 22 Vet.App. 29, 32 (2008) ("An essential principle of due process is that deprivation of a protected interest must 'be preceded by notice and an opportunity for hearing appropriate to the nature of the case.'" (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950))). The process used by the RO satisfied these requirements. Therefore, the Court holds that the June 2003 notice letter adequately notified the appellant of both his right to submit evidence *and* his right to a hearing, and the consequences of failing to do so. *See* 38 C.F.R. § 3.905(b), *supra*.

The appellant also argues that due process requires that "a VA claimant must be adequately informed of the scope and importance of his due process right in order to intelligently waive it." Reply Br. at 2-3. He essentially contends that, in order to adequately inform him of his right to a hearing, VA must inform him "of the importance of presenting his live testimony at a hearing." Appellant's Br. at 10. Assuming that live testimony is as important as the appellant suggests, his argument fails to acknowledge that the June 2003 notice letter, in fact, informed him of the purposes

for a hearing before the agency, i.e., for "receiving contentions, oral arguments, and testimony." R. at 92.

Furthermore, the legal authorities that the appellant relies upon do not support his argument that he could not knowingly waive his right to appear at a hearing because the June 2003 notice letter failed to explain the advantages of presenting live testimony rather than submitting a written statement. *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978), a Social Security case, holds only that the Appellate Counsel needs substantial evidence to reverse a credibility determination of an Administrative Law Judge (ALJ) who witnessed live testimony. *Cowart v. Schwieker*, 662 F.2d 731, 735 (11th Cir. 1981), another Social Security case, deals with an ALJ's statutory duty to investigate relevant facts. It does not conclude that live testimony is necessarily better than written testimony. *Howe v. Goldcorp Investments*, *LTD*., 946 F.2d 944, 952 (1st Cir. 1991), is a forum non conveniens case that held it was proper for a district court to dismiss a suit where none of the relevant witnesses would be subject to subpoena. Hence, *Howe* concluded that an opportunity for live testimony is necessary, but did not usurp the parties' choice as to whether to use it. There is simply no support for the proposition that live testimony will always be in an appellant's interest. Certainly, some people present themselves better in writing than they do orally. The Secretary need not advise the appellant that live testimony will necessarily be more favorable to him.

The appellant also relies on *Janssen v. Principi*, 15 Vet.App. 370, 374 (2001), to support his contention that, "without the benefit of legal counsel, it cannot be said that [he] understood the consequences of waiving his right to present live testimony." Appellant's Br. at 11. To the extent that the appellant is attempting to assert that he was unable to waive his right to a hearing in this instance absent consulting with counsel first, we are not persuaded. While the Court in *Janssen* did focus on representation by counsel in reaching the conclusion that Mr. Janssen could waive the Court's consideration of the Veterans Claims Assistance Act (VCAA) on appeal, it did not require it. 15 Vet.App. at 374. Here, although he was not an authorized VA representative, the record reveals, and indeed the appellant has conceded, that he had been assisting veterans with their claims for benefits since at least 1998. R. at 43. Therefore, the record does not support the appellant's argument that he could not waive his rights without the assistance of counsel.

9

Finally, any assertion by the appellant that he never affirmatively waived his right to a hearing is not convincing. Due process rights may be waived, *see Boddie v. Connecticut*, 401 U.S. 371, 378-79 (1971), so long as such a waiver is made knowingly and voluntarily. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (holding waiver is the "'intentional relinquishment or abandonment of a known right'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))). Here, as discussed above, the appellant was adequately informed of his right to submit evidence and request a hearing within 60 days of the June 18, 2003, letter. Within that timeframe, he chose to provide a written response to the proposed charge in lieu of appearing at a hearing. *See* R. at 105-108; 38 C.F.R. § 3.905(b). In his response, he specifically stated: "I disagree with the charge and wish to rebut it with the following discussion and argument." R. at 105. This specific statement was a clear manifestation of the appellant's intent to address the proposed charge with his written response and discussion. He never referred to wanting to appear at a personal hearing and his failure, in light of the June 2003 notice letter, to request a hearing in his written response or at any time constituted the waiver of his right to a hearing. *Cf. Anderson v. Brown*, 9 Vet.App. 542, 547 (1996) (holding that "[b]ased upon the language in the letter, the Board could reasonably construe the representative's request as the appellant's waiver of his right to a hearing."). Moreover, we observe that the appellant does not contend that he ever requested a personal hearing at any time before or after his August 2003 written submission to VA. Additionally, there is no evidence that he did. Indeed, even when he appealed the forfeiture action to the Board, he checked off the box that stated "I do not want a B[oard] hearing." R. at 290. Nor did he attempt to extend his time to request a hearing. *See* 38 C.F.R. § 3.109(b) (providing that "[t]ime limits within which claimants or beneficiaries are required to act to perfect a claim or challenge an adverse VA decision may be extended for good cause shown").

In short, the Court need look no further than the plain language of the June 2003 notice and the specific procedures outlined in 38 C.F.R. § 3.905(b) to conclude that the appellant's procedural due process rights were adequately protected. *See Loudermill* and *Edwards*, both *supra*; *see also Tilles*, 13 Vet.App. at 324 (noting that "[w]hen Congress was considering amending [section 6103], VA already had established procedures in place of which Congress was fully aware and to which Congress had given tacit approval").

*2. The Board's Reliance on Hearsay Evidence*

The appellant also asserts that "the Board violated basic due process principles by basing its decision to forfeit [his] benefits upon fundamentally untrustworthy and unreliable statements; namely, the hearsay statements of [D.S.] and those of [F.A.], who [were] clearly implicated in the charged fraud." Appellant's Br. at 12. The appellant's argument is unpersuasive.

Preliminarily, we observe that the Federal Rules of Evidence generally "do not apply to proceedings before the Regional Office . . . , the Board, or this Court." *Bielby v. Brown*, 7 Vet.App. 260, 267 (1994) (citing *Flynn v. Brown*, 6 Vet.App. 500, 503 (1994) (Rules of hearsay evidence do not apply to proceedings before the Board.)); *see also Gabrielson v. Brown*, 7 Vet.App. 36, 40 (1994) (recognizing that the Board's statutory duty to state the reasons or bases for its findings and conclusions serves a function similar to cross-examination in adversarial litigation). Although the Court has indeed noted that a "forfeiture action is an adversarial process initiated by the Secretary to protect the public fisc from false or fraudulent claims and it must be declared 'beyond a reasonable doubt'", *Trilles*, 13 Vet.App. at 326, we are not persuaded that the adversarial rules of evidence should nonetheless apply in this context.

Moreover, we are not persuaded by the appellant's argument that the hearsay statements relied upon by the Board "show none of the indicia of trustworthiness or reliability rooted in any of the hearsay exceptions." Appellant's Br. at 14. To the contrary, the logic of Rule 804(b)(3) of the Federal Rules of Evidence governing statements against interest appears to weigh in favor of the Board's reliance on such statements. That evidentiary rule provides, in pertinent part, that hearsay will not be excluded when it is

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Fed. R. Evid. 804(b)(3).

Here, the statements made by both F.A. and D.S. were against their pecuniary interests insofar as they could potentially render them subject to forfeiture proceedings by VA as well. *See* 38 U.S.C. § 6103(a). F.A., according to the record on appeal, is in receipt of VA benefits. *See*, *e.g.*,

11

R. at 75. Thus, any statements by him regarding his involvement in the procurement of the affidavits could render him potentially subject to VA forfeiture proceedings.[2] Similarly, while the Court acknowledges that D.S. withdrew her DIC claim (R. at 61), a subsequent forfeiture determination regarding her would permanently bar her from any VA benefits. *Id.* The Court holds that the appellant's due process argument is unfounded and therefore concludes that the Board did not err in relying on the statements of F.A. and D.S. in upholding the forfeiture of the appellant's benefits.

We are aware that a prerequisite to the applicability of Rule 804(b)(3) is the declarant's unavailability. *See* Fed. R. Evid. 804(a). However, that does not diminish that rule's underlying rationale regarding the trustworthiness and reliability of such statements. We rely on the substance of Rule 804(b)(3) merely to demonstrate that the appellant's allegation of inherent unreliability of the statements relied upon by the Board as the premise of his due process argument is misplaced.

### B. Duty to Assist

Alternatively, the appellant argues that VA's duty to assist required the RO, "sua sponte," to order a hearing. Appellant's Br. at 16-17. However, the Secretary afforded the appellant the opportunity for a hearing, and the appellant waived that right. *See* R. at 105-108. He cites no statutory or regulatory authority to support this argument. *See* U.S. Vet.App. R. 28(a)(5) (requiring that an appellant's brief contain, among other things, "an argument, beginning with a summary and containing the appellant's contentions with respect to the issues and reasons for those contentions, *with citations to the authorities* and parts of the record on appeal relied on" (emphasis added)); *see also Hilkert v. West*, 12 Vet.App. 145, 151 (1999). While he does contend in his reply brief that "§ 5103A(a)(1) must be read as a sweeping mandate, requiring the VA to provide assistance as the claim requires," he does not indicate how that statutory provision required the Secretary to schedule a hearing sua sponte in this case. Reply Br. at 4-5. The duty to assist under Section 5103A focuses on the Secretary's obligation to provide a claimant with adequate assistance, which was provided in

---

[2] The Court is unaware whether VA has initiated such proceedings and makes no holding on the propriety of such action.

this case.  It does not require the Secretary to paternalistically make a veteran's decisions on the veteran's behalf.  Thus, the Court holds that the appellant's duty to assist argument is untenable.

## III.  CONCLUSION

Accordingly, the Board's May 15, 2006, decision is AFFIRMED.