**BROCKTON SAVINGS BANK,**
**Plaintiff, Appellee,**

v.

**PEAT, MARWICK, MITCHELL & CO.,**
**et al., Defendants, Appellees.**

**First United Fund, Ltd.,**
**Defendant, Appellant.**

**No. 85–1174.**

United States Court of Appeals,
First Circuit.

Argued June 5, 1985.
Decided Aug. 26, 1985.

---

**10.**  *See Commonwealth v. Kater,* 388 Mass. 519, 447 N.E.2d 1190 (1983).

**11.**  *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Edward R. Lev, Boston, Mass., with whom Louis A. Rodriques, Shelagh A. Ellman and Sullivan & Worcester, Boston, Mass., were on brief, for First United Fund, Ltd.

Michael S. Greco, Boston, Mass., with whom Richard M. Zielinski, Robert D. Richman and Hill & Barlow, Boston, Mass., were on brief, for Brockton Sav. Bank.

Before COFFIN, RUBIN * and BOWNES, Circuit Judges.

COFFIN, Circuit Judge.

This appeal raises two basic questions: first, whether the district court abused its discretion by entering a default judgment against defendant, First United Fund, Ltd. (First United),[1] for abuse of the discovery process, including the failure to comply fully with several discovery orders; and second, whether the district court erred by not considering questions of contributory or comparative negligence during a post-judgment hearing on damages.

## I. BACKGROUND [2]

The underlying complaint in this action was filed on February 24, 1983. Plaintiff

---

* Of the Fifth Circuit, sitting by designation.

1. Earlier in the litigation, the district court granted a motion to dismiss separate claims that had been brought against codefendant Peat, Marwick, Mitchell & Co. Since no challenge to that dismissal has been made, Peat, Marwick is not a party to this appeal.

2. This summary of the facts and procedural history is drawn in the main from the magistrate's report of May 14, 1984, which was adopted by the district court on August 9, 1984. A few details not mentioned in that report are drawn from the record, as submitted by the parties.

Brockton Savings Bank (Brockton) alleged that First United, a securities broker-dealer, had acted so as to mislead Brockton into purchasing on April 28, 1982, a 90–day, $1 million Certificate of Deposit (CD) issued by Penn Square Bank, N.A. (Penn Square). Penn Square had failed shortly thereafter, causing Brockton to lose most of its investment. In its complaint Brockton charged that First United had led Brockton to believe that Penn Square had been investigated thoroughly and that its CD was a sound investment. Brockton alleged that no such analysis had been performed and that, had one been, First United would have known that the CD was not a sound investment. On the basis of these and other allegations, Brockton charged that First United had violated federal and state laws governing securities transactions, as well as state laws covering intentional and negligent misrepresentations.

At the same time that Brockton filed its complaint, it also filed a set of interrogatories and a request for the production of certain documents. For the purposes of this appeal, only a few of those interrogatories and requests for documents need concern us. First, Brockton requested that First United identify and produce copies of all original solicitation letters sent to prospective purchasers and sellers of CD's. Second, Brockton requested that First United identify all banks for which it brokered CD purchases and sales. Finally, Brockton requested that First United identify and produce all documents concerning business transactions between First United and Penn Square.

First United's initial response, at the end of April 1983, was to answer partially the interrogatories, to produce a few documents, including one undated and unaddressed "form" letter, and to register several general objections. The most significant objections were that Brockton was requesting material unrelated to its claims, that much of the material was confidential,

and that to produce it would be unduly burdensome.

A motion to compel discovery followed on May 10, 1983. In its accompanying memorandum of law, Brockton argued that what it was seeking was relevant because it was likely to show what First United knew or should have known about Penn Square's financial condition, to identify First United's standard brokerage policies and procedures, to show whether First United deviated from those policies and procedures in brokering the Penn Square CD's, and to identify any other customers who were misled and thus to uncover witnesses who might testify on Brockton's behalf at trial. In its memorandum in response, First United continued to argue the irrelevancy of almost all that was requested and added that the transactions slips, those papers upon which were recorded either quotations to customers or confirmations of purchases, weighed "approximately 1500 pounds". Also, while admitting that no legal privilege protected the documents, First United continued to claim that its customers expected the documents to be kept confidential. Brockton replied that an appropriate protective order could be issued.

On August 18, 1983, a status conference was held before Judge Nelson. At that conference, First United was ordered to produce within ten days [3] a list of all Penn Square CD transactions that it had brokered. Thirty-five days later, First United produced a list of banks that it had serviced, omitting any reference to their addresses or to the types of CD's purchased. This was but the first of four instances in which First United's response to a court order was both untimely and partial.

Brockton renewed its motion to compel and the matter was referred to a magistrate. In the hearing that followed on October 18, 1983, First United continued to object to discovery on the grounds of bur-

---

**3.** Although First United contests the magistrate's finding as to the ten-day deadline and no record was made of the conference, we have no real reason to doubt that such a deadline was set.

Initially based solely upon an affidavit filed by Brockton's attorney, this finding has since been reviewed and adopted by Judge Nelson, who gave the order in the first place.

densomeness and confidentiality. Brockton responded that it would undertake the burden of going through the requested documents at First United's offices in Long Island and that, if confidentiality were perceived to be a problem, First United needed only to accept the protective order that Brockton had offered. First United gave no indication that it would accept that offer; nor did it request a protective order from the magistrate. At the end of the hearing, the magistrate granted Brockton's motion to compel. After consulting with First United to ensure that it would be given enough time to comply, the magistrate ordered it to produce supplemental answers by November 23, 1983, and the balance of the requested documents by December 5, 1983. To reduce First United's burden, he ordered that the documents be produced at its offices in Long Island, rather than in Boston.

On November 23, 1983, First United filed supplemental answers under seal but did not serve a copy of them on Brockton. First United also moved for a protective order to ensure the confidentiality of all the documents that a month earlier it had been ordered to produce. Brockton opposed the motion on the twin grounds that it came too late and that the proposed order was so broad that it would be used by First United to frustrate discovery in the future. There appeared to be reason for the latter concern, for in the supplemental hearing of December 2, 1983, First United represented that "virtually all of the documents that have been requested" were confidential, including the "confirmation slips, invoices, and letters". The magistrate rejected this argument and denied the motion, except with regard to the list of Penn Square transactions, which Brockton agreed could be kept confidential. First United subsequently appealed the denial of a broader protective order and filed for a stay of production of documents until Judge Nelson decided the appeal. The stay was granted. On December 5, 1983, twelve days late, First United served its supplemental answers on Brockton.

On January 18, 1984, Judge Nelson held a brief hearing and entered a one-sentence protective order requiring each party to use only for litigation purposes whatever information was provided by the other party. This protective order was much simpler than the one requested by First United and appears to have been responsive to Brockton's fears that First United's draft order would permit it to continuously challenge Brockton's discovery demands. Judge Nelson ordered First United to produce all requested documents within ten days and denied First United's request to produce only "exemplars" or "forms" of requested letters.

Although some documents were produced within the ten days, First United failed to produce all of the transaction slips that had been ordered and again submitted only form solicitation letters. Frustrated by this response, Brockton filed a motion for sanctions, including judgment by default, an order of contempt, and an award of attorney's fees. On February 16, 1984, twenty days late, the balance of the transaction slips was produced. Also on February 16, First United's attorney, by letter, suggested to Brockton for the first time that copies of the actual letters of solicitation did not exist.

This new information came to the court's attention on March 1, 1984, when the magistrate held the first of several hearings on Brockton's motion for sanctions. At that time, the magistrate was handed the affidavit of an "Executive Secretary" of First United, in which she stated that only eight form letters were used to communicate with prospective customers and that only these letters and lists of customers and their addresses were retained in First United's word processor; she claimed that no copies of letters actually sent were retained anywhere in First United's offices. The magistrate was startled by this information for two reasons: first, it did not accord with the fact that First United's attorney for months had been protesting the confidentiality of documents such as these and the burden of producing them; and second, the actual solicitation letter produced by

Brockton from another First United customer, on First United's letterhead, was in significant part different from the form letters that First United had produced.

Faced with these discrepancies, and concerned that either documents had been destroyed or the court and Brockton had been purposely misled for a period of several months, the magistrate ordered First United's attorney to have the affiant-secretary and First United's president appear in court five days later. Although unsure of the president's schedule, First United's attorney gave no indication that either the president or the secretary would be unwilling to appear.

When the hearing was continued on March 6, 1984, however, neither the secretary nor the president did appear. Initially, First United's attorney thanked the court for having given the opportunity to produce live testimony concerning the motion for sanctions but then stated that First United chose to stand on the record as it existed. When informed that the witnesses' appearances had been ordered, not requested, the attorney answered, "[M]y client chooses not to obey." When asked about the secretary, the attorney answered that he had not spoken with her because he did not realize that he should have. Perceiving no end to First United's unsatisfactory compliance with the court's orders and no willingness on First United's part to take advantage of the opportunity to persuade the court that the requested sanctions were inappropriate, the magistrate closed the hearing by stating that he intended to recommend to the trial judge that the severest sanctions be imposed.

On March 16, 1984, First United retained new counsel. On March 19 and 21, additional hearings were held to give new counsel an opportunity to change the magistrate's mind. Counsel's efforts did not succeed, however, and on May 14, 1984, the magistrate issued his report recommending the entry of default judgment and award of costs and attorney's fees against First United. These recommendations were based on the magistrate's findings that First United had

> "wilfully disobeyed the discovery orders of this court; ... either misled the court and the plaintiff through malice or incompetence as to the existence of the [solicitation letters]; ... deliberately refused to appear and testify when ordered to do so with reference to this late dubious claim of non-retention; and ... abused and frustrated the discovery process at great cost to the plaintiff and the court."

On August 9, 1984, the district judge adopted the magistrate's report and ordered a hearing to determine the amount of the default judgment.

That hearing was held in January 1985. The magistrate allowed evidence only as to the computation of Brockton's total loss. He refused to allow discovery or introduction of evidence as to any negligence on the part of either Brockton or codefendant Peat, Marwick, Mitchell & Co. that might have contributed to Brockton's total loss. Upon the agreement of counsel solely as to the accuracy of the computations performed by Brockton, the magistrate recommended that judgment be entered for $783,868.63. Judge Nelson entered judgment for that amount on January 29, 1985.

## II. DISCUSSION

### A. *Authority of District Court to Enter Default Judgment*

The above, brief summary reveals a most lamentable display of recalcitrance, evasiveness, and disobedience on the part of First United and its then counsel. Its new counsel, in an effort to offset what transpired before it took over the case, has mounted a straightforward technical legal challenge to the court's power to order the president and affiant-secretary to appear. It argues that the validity of the March 1, 1984, oral order to produce these two individuals must rest on Rule 45(e)(1) of the Federal Rules of Civil Procedure, which restricts a court's authority to issue subpoenas "requiring the attendance of a witness at a hearing or trial" to subpoenas

that may be served within the forum district or a place outside the district but within 100 miles of the place of hearing or trial. The place of business of First United's president and the secretary being at a farther remove (Garden City, New York), the argument is made that the order was a nullity and any sanction partly based thereon is without validity.[4]

First United also argues that although the sanctions of Rule 37 of the Federal Rules of Civil Procedure would have been available had the magistrate compelled First United's president and secretary to appear in the forum for a deposition, what the magistrate ordered was their appearance at a "hearing", an event specifically governed by Rule 45. Because it was one of several grounds—and a significant one—relied on by the district court in imposing the sanction of default judgment, First United contends that the default judgment must be reversed or the case must be remanded for reconsideration.

In considering this argument, we observe at the outset that how one characterizes the challenged court action probably determines the result one reaches on this issue. If one begins with the assumption that the court's order of March 1 is in reality a "subpoena requiring the attendance of a witness at a hearing or trial" pursuant to Rule 45, the cases cited by First United make clear that a court cannot force the appearance at a hearing or trial of a witness beyond the court's subpoena powers. *In re Guthrie*, 733 F.2d 634, 637 (4th Cir. 1984); *Jaynes v. Jaynes*, 496 F.2d 9, 10 (2d Cir.1974); *GFI Computer Industries, Inc. v. Fry*, 476 F.2d 1, 5 (5th Cir.1973); *Steel, Inc. v. Atchison, Topeka & Santa Fe Railway*, 41 F.R.D. 337, 339 (D.Kan.1967).

We, however, approach this critical threshold task of characterization with an instructed bias to defer to the district court's view of the situation and, within reason, to accord that court wide discre-

tion. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *Damiani v. Rhode Island Hospital*, 704 F.2d 12, 17 (1st Cir.1983). Here, the court was greatly disturbed by what it termed a "most egregious" negation of the basic assumption underlying this litigation. In its view, documents whose production had been steadfastly resisted on the grounds of irrelevancy, burdensomeness, and confidentiality were suddenly and inexplicably described as nonexistent. This volte-face obviously gave rise to a permissible adverse inference, *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 350–51, 29 S.Ct. 370, 379–80, 53 L.Ed. 530 (1909), that the long sought documents had been destroyed or that First United had otherwise flagrantly misled the court or disregarded its orders. *Cf. Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976) (continued "flagrant disregard" of court's order to produce "ledgers and journals" not expiated by subsequent disclosure that the only business records kept were computerized print-out summaries).

So regarding the situation, the court could have, as in *Emerick*, entered a default judgment under Fed.R.Civ.P. 37(b)(2). Instead, it opted to defer its ruling to accomplish three purposes: to give an opportunity to appellant to explain and justify its latest position, to give an opportunity to Brockton to cross-examine, and to enable the court itself to make inquiries. This scenario is precisely that which the appellee urged upon the court of appeals for the Fifth Circuit in *GFI Computer Industries, Inc. v. Fry*, 476 F.2d at 3–5. In that case a default judgment had been entered against appellant, a resident of the Bahamas, for failure to obey an order of the court directing him to appear, remain, and testify in a Dallas, Texas, proceeding. The district court had entered its order because of its finding that appellant had refused to comply with court orders and evaded multiple

---

**4.** It is interesting to note that this technical objection was not raised during the sanction hearings of March 1, 6, 19, or 21. Not until more than twenty days after the witnesses' failure to appear did new counsel think to bring this point to the magistrate's attention in a posthearing brief.

discovery obligations. The court of appeals, after determining that the district court had an erroneous view of the facts, held:

> "The theory that the court was only benefitting [appellant] by ordering him to do what he could not otherwise be required to do, as a condition to avoiding a default judgment to be imposed for his earlier defaults, falls with the determination that the court's basis for entering the order in the first instance was a misapprehension of the relative responsibilities of the parties for the breakdown in discovery." *Id.* at 5.

In the case at bar there was no misapprehension on the part of the court as to who bore the responsibility for the breakdown in discovery.

We therefore must accept or reject the legal validity of the predicate which the Fifth Circuit found was not factually established in *GFI*. We accept it. In so doing, we do not characterize the district court as acting under Rule 37, although one might analogize the ordered appearance to compelled attendance at a depositional hearing. *See, e.g., First National Bank v. Western Casualty and Surety Co.*, 598 F.2d 1203, 1205–06 (10th Cir.1979) ("depositional hearing" conducted by magistrate to resolve discovery impasse reached during initial deposition is not a "hearing" in the Rule 45(e)(1) sense of that word). Rather, we view the district court as having acted to vindicate the integrity of a proceeding which it had been managing for more than a year.

That the rules of civil procedure do not completely describe and limit the power of district courts seems to us long established, although only infrequently documented—possibly because the rules do take care of most situations. In *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), the Supreme Court recognized that among the inherent powers of federal courts (those "necessary to the exercise of all others", *id.* at 764, 100 S.Ct. at 2463 (quoting *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812)) was, "in narrowly defined circumstances, ... [the] inherent power to assess attorney's fees against counsel." *Id.*, 447 U.S. at 765, 100 S.Ct. at 2463. The authority to hold a party in contempt is another. *Id.* at 764, 100 S.Ct. at 2463. Still another is "the authority of a court to dismiss *sua sponte* for lack of prosecution". *Link v. Wabash Railroad*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962).[5] Perhaps even closer to the power invoked in this case is that invoked in cases where fraud has been perpetrated on the court, even when the relief given is the vacation of a judgment long after it has become final. *See, e.g., Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244, 64 S.Ct. 997, 1000, 88 L.Ed. 1250 (1944); *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946); 7 J. Moore & J. Lucas, Moore's Federal Practice ¶ 60.33, at 60–349—362 (1985).

In all of these instances, the inherent power is said to be "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases". *Link v. Wabash Railroad*, 370 U.S. at 630–31, 82 S.Ct. at 1388–89; *see generally* 1 J. Moore, J. Lucas, H. Fink, D. Weckstein & J. Wicker, Moore's Federal Practice ¶ 0.60[6], at 633–37 (1985). A federal district court must be able "to protect the administration of justice by levying sanctions in response to abusive litigation practices." *Penthouse International, Ltd. v. Playboy Enterprises, Inc.*, 663 F.2d 371, 386 (2d Cir.1981).

It seems to us central to the functioning of a court that it be able *sua sponte* to explore directly and promptly the truth and circumstances of the averred disappearance or "non-retention" of long-assumed existing evidence and to impose

---

5. We long ago, recognized "the inherent and necessary power of courts of general jurisdiction to protect members of the public from vexatious suits through an exercise of the right to dismiss frivolous proceedings...." *O'Connell v. Mason*, 132 F. 245, 247 (1st Cir.1904).

sanctions for the unexplained refusal to permit such exploration. Such power is just as essential and just as reasonable as the powers to dismiss for want of prosecution, to hold parties or counsel in contempt, to dismiss frivolous cases, or to vacate judgments procured by a fraud on the court.[6] Great deterrent value is to be derived from the imposition of sanctions for such abusive litigation practices, *National Hockey League v. Metropolitan Hockey Club,* 427 U.S. at 643, 96 S.Ct. at 2781, and there is, contrary to First United's position, no requirement that other sanctions be first considered or tried. *Damiani v. Rhode Island Hospital,* 704 F.2d at 15.

■ We are mindful of the teaching that "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper,* 447 U.S. at 764, 100 S.Ct. at 2463. We realize that too cavalier a resort to "inherent powers" could result in subverting or trivializing the rules of procedure. But in this case the history of evasiveness and intransigence, the centrality of the evidence at issue, the lack of explanation for the sudden revelation of its "non-retention", the obvious seriousness with which the magistrate viewed the issue, his avowed purpose to offer First United the opportunity to explain and justify the lateness of the revelation, the implicit agreement of counsel to produce the requested witnesses and the giving of a continuance to facilitate their production, and the final contumelious ipse dixit that

counsel for First United had "nothing more to say than that it was his client's decision" not to appear and his client's decision not to permit the appearance of its employee-affiant all conjoin to justify inclusion of the failure to appear as one of several grounds supporting the entry of a default judgment. The district court acted well within its discretion, therefore, in entering such judgment.[7]

### B. *Adequacy of Damages Hearing*

■ First United's second claim is that the magistrate erred by not expanding the scope of the damages hearings to allow evidence as to the extent to which Brockton's total losses were caused not by First United's conduct, but rather by that of Brockton or codefendant Peat, Marwick, Mitchell & Co. In other words, First United argues that the magistrate erred by limiting inquiry to the mere arithmetical computation of Brockton's damages.

First United relies principally upon *Trans World Airlines v. Hughes,* 449 F.2d 51 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), a complex antitrust case involving a multimillion dollar claim for lost profits, which we find to be entirely inapposite.[8] The court there explained that it was the "unliquidated and uncertain" nature of the alleged lost profits that necessitated the holding of a hearing and that the hearing was to be limited to a determination of whether profits had actually been lost and the extent to which any such loss was

6. That such an exploration, involving the production of witnesses beyond the court's subpoena power, would not be vulnerable to a basic attack as beyond the court's jurisdiction over the persons involved seems established. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).

7. As an aside, we reiterate that even if the order to appear were invalid, First United's failure to obey earlier orders, its tactics of delaying discovery, and its failure to reveal the non-existence of the solicitation letters earlier, would by themselves justify default judgment. That the magistrate was ready to recommend this most severe sanction before he ordered the president

and affiant to appear is clear from the transcript of the March 1 and 6 hearings. That First United chose not to take advantage of the opportunity to explain its actions because, as it argued at one point, it felt the magistrate had already made up his mind, reveals not only a lack of judgment and willingness to exhaust remedies but also full awareness that the magistrate was prepared to impose the severest of sanctions if First United did not give a complete explanation of its prior conduct.

8. We note that Fed.R.Civ.P. 55(b)(2), which governs the matter of a damages hearing for a default judgment, says only that the district court "may conduct such hearings ... as it deems necessary and proper...."

attributable to the violations established by the default, rather than to causes beyond the scope of the suit. *Id.* at 70.

Here, by contrast, there is no question as to the precise amount of Brockton's total losses stemming from its investment in the Penn Charter CD—$783,868.63, including pre-judgment interest, as of the time the default judgment was entered.[9] Brockton arrived at this figure by doing simple arithmetical computations, which have gone unchallenged by First United. Under these circumstances, the brief hearing that the court held on the computation of damages was more than sufficient. *Cf. Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir.1983) (hearing unnecessary where "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits").

Moreover, there is no question that, default having been entered, each of Brockton's allegations of fact must be taken as true and each of its seven claims must be considered established as a matter of law. *Id.* Since one of Brockton's claims was that First United intentionally misrepresented certain facts and thereby caused Brockton's total loss, and since "[t]he general rule is that contributory negligence is a defense only to actions grounded on negligence", *Curry v. Fred Olsen Line*, 367 F.2d 921, 928 (9th Cir.1966), we find no merit in the argument that First United should have been allowed to prove that Brockton's conduct contributed to its damages.[10]

As for Peat, Marwick, Mitchell & Co., its motion to dismiss the five separate claims brought against it was granted long before

the damages hearing was held, and we find no indication in the record that First United ever brought any cross-claims against Peat, Marwick. There was therefore no reason to consider how Peat, Marwick's conduct might have contributed to the damages. Moreover, even if these claims had not been dismissed, they were substantially different from the seven claims brought against First United, both in form and substance. Thus, First United's reliance upon cases such as *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1262–63 (2d Cir. 1980), which involved a single claim against multiple defendants, is misplaced. There the concern was that two distinct damage awards might result "on a single claim involving joint and several liability." *Id.* at 1262. Here, because there were different claims against the two defendants, based on different alleged acts and omissions, different determinations as to either liability or damages would not necessarily be inconsistent with one another. *See generally*, 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 55.06, at 55–41 —42 (1985).

Accordingly, we conclude that the entry of default judgment was proper and that the inquiry solely to determine the amount of damages was procedurally sufficient.

*Affirmed.*

---

**9.** This amount is less than Brockton's original $1 million investment because Brockton received certain reimbursements from the Federal Deposit Insurance Corporation ("FDIC").

**10.** Although First United assumes at one point that New York's law might apply and refers us to that state's provision governing contributory negligence, N.Y.Civ.Prac. Law § 1411 (1975), we find nothing in that provision to suggest that it would be applicable where the defendant has been found liable for an intentional tort. *See,*

*e.g., Leiner v. First Wythe Avenue Service Station*, 121 Misc.2d 559, 468 N.Y.S.2d 302, 305 (N.Y.City Civ.Ct.1983) ("Where the tort complained of does not allow for a defense of contributory negligence, the adoption of CPLR 1411 will not be the instrument of its creation."); *Clark Operating Corp. v. Yokely*, 120 Misc.2d 631, 466 N.Y.S.2d 204, 205 (N.Y.City Civ.Ct. 1983) ("The duty of mitigation is not required in the case of intentional or malicious injuries.").