THOMSON INFORMATION SERVICES
INC., d/b/a Thomson Financial
Services, Plaintiff,

v.

BRITISH TELECOMMUNICATIONS,
PLC., Defendant.

C.A. No. 96–10819–JLT.

United States District Court,
D. Massachusetts.

Aug. 28, 1996.

Peter A. Biagetti, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Plaintiff.

Michael A. Walsh, Michael Arthur Walsh, Choate, Hall & Stewart, Boston, MA, for Defendant.

## MEMORANDUM

TAURO, Chief Judge.

Thomson Information Services, Inc. ("Thomson/US") brings this action against British Telecommunications, plc. ("BT"), a corporation of the United Kingdom with its principal place of business in London. Presently before the court is BT's motion to dismiss on the alternative grounds that Thomson/US lacks standing to sue and that England is the proper forum for resolution of this dispute.

### I.

### *BACKGROUND*

The Thomson Corporation ("Thomson"), a Canadian corporation with its principal place of business in Toronto, owns approximately twenty-three affiliated companies engaged in the business of providing financial services under the trade name Thomson Financial Services ("TFS"). One of these subsidiaries, Thomson/US, is the plaintiff in this case. Thomson/US is a New York corporation with its principal place of business in Boston, Massachusetts. One of the operating divisions of Thomson/US is the Electronic Settlements Group ("ESG"). Another of Thomson's subsidiaries is Thomson Financial Services, Ltd. ("Thomson/UK"), a United Kingdom corporation with its principal place of business in London.

In June 1994, the Bank of England announced that it intended to put in place a new paperless system, referred to as "CREST," for settling and accounting for stock trades made daily on the London Stock Exchange. The Bank of England issued a Request for Information ("RFI") from potential suppliers of network services for the CREST system. The RFI stated that a maximum of four suppliers would be selected, and that any such supplier would have to be accredited by the Bank of England.

Thomson/US alleges that BT wished to become a service provider, but that, while BT possessed the technical capacity to wire such a communications network, it lacked the "experience, credibility or client-base in the British financial community needed to properly design, service or sell the network and its related value-added services." Verified Complaint ¶ 1. Allegedly because TFS[1] possessed these characteristics, BT turned to it as a potential joint venturer. In June and July 1994, TFS and BT commenced discussions concerning their undertaking such a joint venture. Meetings between the parties were held at the London offices of BT, Thomson/UK, and the Bank of England.

The initial fruit of these discussions was a "Heads of Agreement," signed at BT's London offices on July 29, 1994 (the "1994 HOA"). Exhibit A attached to the Verified Complaint. The principle negotiators for TFS were Ian Perham and Robert Hayim, both employees of Thomson/UK. Prior to signing the agreement, Hayim received authorization to do so from Howard Edelstein, the President of the ESG.

On August 4, 1994, BT and TFS submitted a joint response to the CREST RFI to the Bank of England. The letter covering the joint submission explained that, as they had signed an agreement, BT and TFS were jointly submitting a proposal. Exhibit B attached to the Verified Complaint. At the top of the cover letter, BT and Thomson/UK are identified as the parties making the submission.

---

1. After identifying the various Thomson corporate entities, Thomson/US's complaint lumps them together under the rubric of the TFS trade name. Verified Complaint ¶ 6. For the purposes of setting forth the relevant facts in this background section, the court accepts this designation. The court notes, however, that in doing so it is not deciding who, on the Thomson side of the relationship, is the real party to the relationship with BT.

In late August 1994, TFS and BT negotiated and signed a Confidentiality Agreement (the "Confidentiality Agreement"). Exhibit A attached to Jones Affidavit. The Confidentiality Agreement was executed in BT's London offices and signed for TFS by Perham.

In October 1994, the Bank of England announced the selection of the BT/TFS joint venture, as well as another bidder, to supply network services to CREST. During the ensuing months, BT and TFS continued to proceed with marketing and development efforts for the project.

In addition to meetings regarding the development and marketing of the network service, TFS and BT undertook to further solidify their relationship. These efforts culminated in the signing of a second Heads of Agreement in July 1995 (the "1995 HOA"), signed on behalf of TFS by Edelstein. Exhibit D attached to Verified Complaint. Negotiation of the 1995 HOA took place over a two day period at TFS's Boston offices. The 1995 HOA set forth the general parameters of the parties' joint venture and set a September 1, 1995 deadline for finalizing the terms of the venture. This deadline was extended to December 1, 1995.

In an effort to set the terms of the venture, the parties met again in London in November 1995. This meeting led to the preparation of a nonbinding terms sheet. Exhibit F attached to the Verified Complaint. Nonetheless, the parties were unable to complete a contract by the December 1, 1995 deadline and, on December 4, 1995, TFS sent an invoice to BT, demanding payment of $38.4 million related to expenditures undertaken by TFS and BT's use of TFS's name and goodwill. BT has not paid this demand.

On March 6, 1996, Thomson/US filed this action in Suffolk Superior Court of the Commonwealth of Massachusetts. BT timely removed to this court.

Thomson/US pleads nine counts. Count One alleges that BT owed TFS a fiduciary duty as a joint venture partner and that BT breached that duty. Count Two alleges that BT breached the 1994 HOA, the Confidentiality Agreement, and the 1995 HOA by unilaterally refusing to finalize the partnership and by converting TFS's proprietary information. In connection with TFS's reliance on BT's representations to proceed as a joint venture partner on the CREST project, Counts Three, Four, and Five bring claims for, respectively, promissory estoppel, fraudulent inducement, and negligent misrepresentation. Count Six alleges that, prior to the CREST project, TFS had a valuable business relationship with the Bank of England and that BT wrongfully interfered with that advantageous business relationship. Counts Seven and Eight present, respectively, a statutory claim for misappropriation of trade secrets and a common law claim for unjust enrichment as a result of BT's use of TFS's proprietary information. Finally, Count Nine alleges that BT has committed an unfair and deceptive trade practice, in violation of Mass.Gen.Laws ch. 93A, § 11.

## II.

### DISCUSSION

■ BT maintains that Thomson/US lacks standing to sue because they are not a party to the agreements and, alternatively, that the action should be dismissed on the ground of forum non conveniens. The court turns first to the forum non conveniens issue.[2]

---

**2.** Though a court should not consider a motion for dismissal under the forum non conveniens doctrine if it is without jurisdiction, *see Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 67 S.Ct. 839, 840, 91 L.Ed. 1055 (1946) ("the doctrine of forum non conveniens can never apply if there is absence of jurisdiction or a mistake of venue"), the court does not consider BT's contention regarding Thomson/US's standing to sue under the agreements as a challenge to this court's Article III jurisdiction. Rather, BT's contention is better understood as relating to whether TFS/US has stated a claim. *See, e.g., Bross Utilities Ser-*

*vice Corp. v. Aboubshait*, 618 F.Supp. 1442, 1444–46 (S.D.N.Y.1985) (granting summary judgment on ground that parent corporation could not assert a contract claim for a contract entered into by subsidiary); *Coast Mfg. Co., Inc. v. Keylon*, 600 F.Supp. 696, 697–98 (S.D.N.Y. 1985) (dismissing parent corporation's effort to assert claims of subsidiary for failure to state a claim). *See generally* 13 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure* § 3531, 341–42 (explaining misapplication of standing analysis to claims of private wrongdoing).

Where the plaintiff is a resident of the forum in which an action is brought, a defendant faces an extremely difficult task in persuading a court that an action should be dismissed for forum non conveniens. *Mercier v. Sheraton Int'l, Inc.,* 981 F.2d 1345, 1349 (1st Cir.1992) ("there is a strong presumption in favor of the plaintiff's forum choice"), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 255 (1993) (hereinafter *"Mercier II"*). The defendant bears "the burden of proving *both* the availability of an adequate alternative forum, and the likelihood of serious unfairness to the parties in the absence of transfer to the alternative forum." *Id.* (emphasis in original).

### A. *Availability and Adequacy Of Alternative Forum*

■ There is no dispute that England is an available forum for the dispute between the parties. Moreover, as suggested by a long line of cases, England is generally considered an adequate forum. *See, e.g., Nolan v. Boeing Co.,* 919 F.2d 1058, 1068 (5th Cir. 1990), *cert. denied,* 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991); *Kultur Int'l Films Ltd. v. Covent Garden Pioneer, FSP., Ltd.,* 860 F.Supp. 1055, 1064–65 (D.N.J.1994); *Banco Nominees Ltd. v. Iroquois Brands, Ltd.,* 748 F.Supp. 1070, 1073 (D.Del.1990). Thomson/US contends, nonetheless, that the laws of England are inadequate in this case because they do not provide an analogue to Mass.Gen.Laws ch. 93A. The court disagrees.

■ Determining the adequacy of an alternative forum does not rest on whether that forum offers the full panoply of remedies available in the plaintiff's chosen forum under the operative facts of the case. *Howe v. Goldcorp Investments, Ltd.,* 946 F.2d 944, 947 (1st Cir.1991) (differences in the nature of an alternative forum's remedy does not render it inadequate), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992). Instead, the inquiry should be whether the remedies provided by an alternative forum are " 'so clearly inadequate or unsatisfactory that it is no remedy at all.' " *Mercier II,* 981 F.2d at 1352 n. 5 (quoting *Piper Aircraft Co.*

*v. Reyno,* 454 U.S. 235, 254, 102 S.Ct. 252, 264, 70 L.Ed.2d 419 (1981)).

Except for the absence of a claim analogous to Mass.Gen.Law ch. 93A, England provides similar remedies to those asserted in the complaint by Thomson/US. Wynter Affidavit ¶¶ 5–31. The mere fact that under these allegations a claim arises under Massachusetts law that does not arise under English law does not render Thomson/US with no remedy in England. *See, e.g., Kempe v. Ocean Drilling & Exploration Co.,* 876 F.2d 1138, 1145 (5th Cir.) (absence of equivalent of RICO in foreign jurisdiction does not bar dismissal on grounds of forum non conveniens where foreign law permits recovery for fraud, negligence, and breach of fiduciary duty), *cert. denied,* 493 U.S. 918, 110 S.Ct. 279, 107 L.Ed.2d 259 (1989). Accordingly, the court concludes that BT has met its burden of showing the adequacy and availability of England as an alternative forum.

### B. *Fairness Of Litigating In Massachusetts*

■ In determining the likelihood of serious unfairness of litigating in the plaintiff's chosen forum, the court considers the respective private and public interests in litigating in the competing forums. *Mercier v. Sheraton Int'l, Inc.,* 935 F.2d 419, 424 (1st Cir.1991) (hereinafter *"Mercier I"*). Private interest factors include the comparative convenience of the parties' access to sources of proof, the availability of compulsory process and, generally, an evaluation of "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1946). Public interest factors "include the administrative difficulties resulting from court congestion in the plaintiff's chosen forum; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a case conducted in a forum that is at home with the governing law; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of imposing jury duty on citizens in an unrelated forum." *Mercier II,* 981 F.2d at 1354 (quoting *Piper Aircraft Co. v.*

*Reyno,* 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 258 n. 6, 70 L.Ed.2d 419 (1981)).

■ In weighing these factors, the court recognizes that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil,* 330 U.S. at 509, 67 S.Ct. at 843. "The deference accorded the plaintiff's choice of forum is enhanced when the plaintiff has chosen a forum in which the defendant maintains a substantial presence." *Mercier II,* 981 F.2d at 1354. Nonetheless, the deference due to an American plaintiff's selection of an available American forum is not absolute, for "[f]orum non conveniens is a 'flexible, practical' doctrine, *Howe,* 946 F.2d at 950, not subject to a ritualistic application." *Mercier II,* 981 F.2d at 1354.

### 1. *Private interest factors*

■ As an initial matter, Thomson/US acknowledges that, of the class of all possible witnesses, the overwhelming majority reside in the United Kingdom. Thomson/US attempts to escape the consequences of this admission by urging that the court's inquiry be narrowed to the class of "key" witnesses. From that subclass, Thomson/US maintains that three reside in the United States and three in the United Kingdom.

The court appreciates that not every person who tangentially came into contact with this dispute will be called to testify. But, neither the parties nor the court can anticipate, at such an early stage of the litigation, the precise contours of the trial. And so, contrary to Thomson/US's contention, the court's task is not to identify who will be the parties' key witnesses, but rather to estimate whether those listed as possible witnesses can offer relevant and material testimony. *See Reid–Walen v. Hansen,* 933 F.2d 1390, 1396–97 (8th Cir.1991) ("[t]he district court must examine the materiality and importance of the anticipated witnesses' testimony"). Indeed, an effort to penetrate the merits of the dispute to the degree suggested by Thomson/US would be contrary to the Supreme Court's declaration that the court is not required to engage in an extensive investigation before deciding a forum non conveniens motion. *Piper,* 454 U.S. at 257, 102 S.Ct. at 266.

Taking this broader view of the court's inquiry, it is clear that almost every possible witness resides in England. First, all the employees of BT possessing potentially relevant testimony reside in England. Second, another principle negotiator of the 1995 HOA for TFS, Kevin Milne, resides in England. Third, Ian Perham and Robert Hayim, two former employees of Thomson/UK who participated in negotiating and drafting the agreements, reside in England. Finally, nearly every other nonparty witness resides in England, including (1) representatives from the Bank of England, who could provide relevant testimony regarding Thomson/US's claim that BT interfered with its advantageous business relationship with the Bank, (2) clients of BT, who could provide relevant testimony regarding the damages sustained by Thomson/US from the alleged misappropriation by BT of client information and the alleged use by BT of TFS's name and good will, and (3) independent consultants that participated in meetings between TFS and BT and can testify as to what was said, and by whom.

Moreover, the several nonparty witnesses will not be subject to compulsory process by this court. *See Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 771 F.2d 5, 10 (1st Cir.1985), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986). And, though these witnesses may be subject to being deposed, such testimony is generally less interesting and effective than live testimony. *See Gulf Oil,* 330 U.S. at 511, 67 S.Ct. at 844; *Kultur Int'l Films,* 860 F.Supp. at 1067. Here, reliance on depositions would be especially tedious given the disproportionate volume of testimony that would need to be submitted in that manner.

In contrast to these aforementioned burdens, Thomson/US's burdens of litigating in England are slight. The only relevant witnesses residing in the United States are Mason Slaine, Howard Edelstein, Keith Jarrett, and Christopher Walsh. They are all employees of TFS or Thomson/US and, therefore, under their control. The expense of

taking them to England for trial will not unduly burden Thomson/US.

The location of the documentary evidence also favors an English forum. BT's records are maintained in England. All of the relevant documents possessed by nonparties are in England. Thomson/US maintains that it possesses records in its Boston office. But, it is reasonable to assume, given the circumstances of this case, that documents relating to the transaction are also maintained at Thomson/UK's office in London.[3] And so, while copies of some of the relevant documents may be available in the United States, all or nearly all of the relevant documents are in England.

Finally, an English court can more easily oversee the conduct of this litigation. Because the bulk of documents and witnesses are in England, it would be difficult for this court to oversee discovery. Moreover, if the action proceeds here, discovery will be further complicated by the necessity of complying with the procedures of the Hague Convention. 28 U.S.C.A. § 1781 (West 1994).[4]

For all of these reasons, the court concludes that the balance of the private interests strongly favors resolution of this dispute in an English forum.

### 2. *Public interest factors*

Turning to the public interest factors, the most striking aspect is the predominance of England's interest in this matter. The alleged breach of the agreements and breach of BT's fiduciary duty relate to the opportunity to provide communication services to the London Stock Exchange. The cover letter to the proposal submitted to the Bank of England bears the names of two corporations of the United Kingdom, BT and Thomson/UK. The business relationship of TFS that BT allegedly interfered with was with the Bank of England.

Further, the agreements themselves disclose the primacy of England's interest in this action. The 1994 HOA clearly identifies the parties as BT and "Thomson Financial Services of Aldgate House, 33 Aldgate High Street, London." If the inscription of the corporate address were not enough to specify Thomson/UK as the party to the 1994 HOA, the signature line plainly states that Robert Hayim was signing "for and on behalf of Thomson Financial Services, Ltd." The Confidentiality Agreement is similarly unambiguous—the introductory paragraph identifies "Thomson Financial Services Ltd. of Aldgate House, 33 Aldgate High Street, London" and BT as the parties, and Ian Perham signed the agreement "for and on behalf of Thomson Financial Services Ltd." Accordingly, two of the three agreements at issue in this case solely involve English corporations.

Thomson/US relies primarily on the fact that the 1995 HOA was negotiated and signed in Boston, as support for its assertion that this forum has a significant stake in this dispute. The court is unpersuaded. Though the text of the 1995 HOA ambiguously refers to "TFS" without further specification, this language does not reflect an intention of the parties to alter the identity of the contracting parties and, in any case, does not suggest that Thomson/US is a party to the agreement. Thomson/US appears to concede as much by its effort to characterize its claims as belonging to TFS. But, insofar as TFS could be the proper party to the 1995 HOA, neither Massachusetts nor the United States has any special interest in enforcing contracts made by it. TFS comprises over twenty-three commonly owned and operationally affiliated corporations. The owner of those twenty-three affiliated corporations is Thomson, a Canadian corporation with its principal place of business in Toronto, Canada.

---

**3.** Thomson/US suggests that BT has failed to specifically identify which documents are critical to this case and, thus, fails to meet its burden. The court, however, does not believe that BT must leap this nearly impossible pretrial hurdle to succeed on its motion. Rather, it is sufficient for BT to identify the location of sources of documentary evidence that is likely to contain relevant and material information. If it were otherwise, a party seeking dismissal on forum non conveniens grounds could rarely meet their burden prior to undertaking extensive discovery. *Cf. Piper*, 454 U.S. at 258, 102 S.Ct. at 266.

**4.** For example, deposition testimony of nonparty witnesses and documents in the possession of nonparties must be procured through letters of request to an English court. *See generally Kultur*, 860 F.Supp. at 1067 (discussing procedures for compelling deposition testimony of witnesses in England).

In addition to the overwhelming local interest of England in this matter, application of Massachusetts' choice of law principles would dictate selection of the laws of England and Wales if the action remained in this forum. The 1994 HOA is between English corporations and was negotiated and signed in England. The same applies to the Confidentiality Agreement, with the added bite that it contains a choice of law provision designating the laws of England and Wales.

With respect to the other contract and tort claims advanced by Thomson/US, the court concludes that, balancing the respective significant interests, the laws of England and Wales apply. There can be no doubt that an English court is better equipped to apply that body of law than is this one.

Finally, Thomson/US cannot muster a persuasive argument that it would be unfair to require litigation of this matter in England. After all, Thomson/US sought to perform vital services for that country's most important capital market. Moreover, it expressly agreed to England as a forum in the Confidentiality Agreement.[5]

The court finds instructive an opinion by Justice Clark, written while sitting with the Eighth Circuit. *J.F. Pritchard & Co. v. Dow Chemical of Canada, Limited*, 462 F.2d 998 (8th Cir.1972). In that case, an American construction company, Pritchard, brought an action against a Canadian chemical company for failing to make payments pursuant to an agreement to build a chemical plant in Canada. *Id.* at 1000. The contract had been negotiated at Pritchard's offices in Kansas City, Missouri, but was drawn in the name of Pritchard's Canadian subsidiary and contained a Canadian choice of law provision. *Id.* And, though the construction itself was performed in Canada, the principal design, engineering, drafting, and managerial work was performed at Pritchard's Kansas City offices. *Id.* at 1000–01. In affirming the district court's dismissal on forum non conveniens grounds, Justice Clark observed:

> [Pritchard] chose to make its Canadian subsidiary the sole performing party to the contract; it is located in Canada; [Pritchard] performed the contract there; and Canadian law was chosen by [Pritchard] to apply to all interpretations of it. Thus there is more than a Canadian nexus here. The whole case is Canadian. [Pritchard] made his bed in Canada; now he must lie in it if he wished to proceed.

*Id.* at 1002. Here, Thomson/US has made its bed in England.

For all these reasons, the court concludes that BT has satisfied its heavy burden of showing that the public interest, when weighed together with the balance of the private interests, merits dismissal of this action.[6]

### III.

### *CONCLUSION*

For the reasons stated above, BT's motion to dismiss this action on the ground of forum non conveniens is ALLOWED.[7]

An order will issue.

### ORDER

The court hereby orders that Defendant's Motion to Dismiss on the ground of forum non conveniens is ALLOWED.

IT IS SO ORDERED.

---

5. In a sense, of course, Thomson/US did not agree because Thomson/UK is the real party to the Confidentiality Agreement. Nonetheless, insofar as Thomson/US seeks to bring claims under that agreement, the forum selection clause may be fairly attributed to it for the purposes of deciding this motion.

6. As the court was preparing to issue this memorandum, the First Circuit handed down its opinion in *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708 (1st Cir.1996). Though the *Nowak* court relied on dictum from the 1947 Supreme Court case of *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 831, 91 L.Ed. 1067 (1947), it did not purport to alter the standard articulated in *Mercier II* for deciding forum non conveniens motions. In any event, the court finds that dismissal is appropriate under the *Koster* standard for the reasons discussed above.

7. In light of the court's disposition of the forum non conveniens issue, the court declines to reach the issue of whether Thomson/US has standing to assert the claims contained in its complaint.