Siebenell Corp. v. Horst Heubach      CV-94-133-JD  12/04/96
                 UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Siebenell Corporation

        v.                              Civil No. 94-133-JD

Horst Heubach


                         O P I N I O N


     The plaintiff, Siebenell Corporation, brought this action

against the defendant, Horst Heubach, to recover damages arising

from the failure of a business venture created during the early

1990s to capitalize on the increasing popularity of the snowboard

and to foster the growth of another winter recreation product,

the monoski.


                    Factual Background[1]

     The principal of the plaintiff is Robert Ellerhorst, who is

also the principal of Crown Plastics.  Since 1972, Crown Plastics

_____

     [1]At the damages hearing that gives rise to this opinion, the
defendant vigorously contested the version of the facts presented
by the plaintiff.  However, the defendant's ability to do so
successfully is limited by his default, as detailed infra.  See
Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5,
13 (1st Cir. 1985), cert. denied sub nom. First United Fund, Ltd.
v. Brockton Sav. Bank, 475 U.S. 1018 (1986).  Although this
background recitation focuses on facts not disputed in the
hearing, to the extent the court recounts facts about which there
was conflicting testimony at the hearing it makes the factual
findings recited herein.

has manufactured a tough, abrasion-resistant polyethylene with a low coefficient of friction. These characteristics make the plastic desirable as a surface for winter recreation products such as snowboards, and currently seventy percent of Crown Plastics' output is used in winter recreation products. In 1991, before Crown Plastics' entry into the winter recreation market, Ellerhorst sensed an opportunity to make a substantial profit in the growing snowboard industry and the emerging monoski industry. He formulated a business plan that called for him to supply the capital for such a venture. Having no personal experience with winter recreation product manufacture, Ellerhorst began searching for a partner to provide the product manufacturing expertise he lacked.

In early 1992, after a period of investigation, Ellerhorst approached the defendant about providing manufacturing expertise for the operation. Ellerhorst proposed that the defendant set up and run the manufacturing operation. Ellerhorst and Heubach entered an oral agreement under which the plaintiff would pay the defendant a $30,000 annual salary and the defendant would use his best efforts to establish a manufacturing facility, working exclusively and full time for the plaintiff. The defendant's salary would increase once the facility became operational. As further compensation, the defendant was given a ten percent

2

ownership interest in Siebenell Corporation, the plaintiff, which was formed in April 1992 to facilitate the venture.

Because the snowboard industry was growing rapidly, Ellerhorst felt it necessary to move the venture forward as quickly as possible. The defendant recommended G & G Makeall ("G & G") as a potential manufacturer of the specialized equipment needed to set up the manufacturing operation. G & G provided a quotation stating that it would deliver equipment "latest June 30 [1992]." The plaintiff secured a lease for a location suitable for the manufacturing operation in Lawrenceburg, Indiana, with the expectation that it could begin limited production for the 1992-93 season. That estimate proved to be overly optimistic. Despite the defendant's repeated assurances that production would be able to commence in the near future, delays preventing production from beginning continued for over a year and a half.

By December 1993, the plaintiff still had no functional production facility in existence and it had become clear to Ellerhorst that the venture was not working. At some point during that month, Ellerhorst was informed that the defendant was working with a competitor to establish a competing manufacturing facility next door to the defendant's home. Ellerhorst visited the plaintiff at his home and observed several nonfunctional

3

pieces of the plaintiff's equipment at the competing factory. Based on this and other evidence, the plaintiff concluded that the defendant not only had not been using his best efforts to get the factory up and running but also had been working for a competitor. Ellerhorst evaluated the situation and determined that the best course of action was to declare the venture a failure, cut his losses, and sell the plaintiff's assets to recoup what funds he could. During 1994-95, the plaintiff sold all its equipment.

Procedural History

The plaintiff filed this action in February 1994, alleging six different claims. Count I alleges that the defendant breached his employment contract with the plaintiff. Count II alleges that the defendant made material misrepresentations to the plaintiff. Count III alleges that the defendant breached the implied covenant of good faith and fair dealing. Count IV alleges that the defendant tortiously interfered with the plaintiff's prospective business relations. Count V alleges that the defendant engaged in unfair trade practices. Count VI alleges that the defendant converted the plaintiff's property. The plaintiff first sought and obtained an order enabling it to remove its equipment from the premises of the competing facility

4

next door to the defendant's residence and to transport it to the Lawrenceburg facility. The case then proceeded on the merits of the plaintiff's substantive claims.

On March 30, 1994, the defendant filed a counterclaim against the plaintiff.[2] Count I alleges that the plaintiff breached the contract between the parties. Count II alleges that the defendant is entitled to recover in quantum meruit the value of services provided to and funds expended on behalf of the plaintiff. Count III alleges that the plaintiff intentionally interfered with the defendant's business relationships. Count IV alleges that the plaintiff negligently interfered with the defendant's advantageous business relationships.

The defendant was initially represented by counsel, but on April 6, 1995, the defendant's counsel filed an unopposed motion to withdraw (document no. 25) which the court granted. On May 4, 1995, the clerk informed the defendant of the withdrawal and ordered that by May 24, 1995, he advise the court of either the name of a new attorney or his decision to proceed pro se (document no. 26).

---

[2]Unique Consulting, Inc. and Unique Ski, Inc. were also defendants to the action at that time. Subsequently, they entered into an agreement with the plaintiff each dismissing the claims against the other (document no. 31) and leaving Heubach as the only defendant in this proceeding.

On June 2, 1995, after receiving no response from the defendant, the court entered a default against him (document no. 27). In response, on June 14, 1995, the defendant entered an appearance pro se (document no. 28). Then, on February 12, 1996, the defendant obtained new counsel (document no. 32) and sought to have the default vacated (document no. 33). On March 1, 1996, the court denied the defendant's motion (document no. 41). On August 29, 1996, the defendant's record counsel withdrew (document no. 46) and on September 23, 1996, the defendant filed another pro se appearance (document no. 48).

The defendant's default resolved in favor of the plaintiff all issues regarding the defendant's liability to the plaintiff, leaving only the issue of damages for resolution by the court.[3] See Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985), cert. denied sub nom. First United Fund, Ltd. v. Brockton Sav. Bank, 475 U.S. 1018 (1986). On November 13

---

[3]The defendant's default precluded him from prevailing on the majority of his counterclaims because it serves as an admission of facts fatal to his theory of recovery. The effective admission that he breached the contract forecloses his claim that it was actually the plaintiff who breached the contract (Count I). The effective admission that he agreed to work exclusively for the plaintiff forecloses his claim that the plaintiff interfered with his business relationships with other clients (Counts III and IV). The defendant's remaining claim for recovery in quantum meruit (Count II) falls because of his larger failure to prove at the hearing any of his alleged expenditures on behalf of the plaintiff or the value of any services he allegedly provided, see infra ¶ 9.

and 14, 1996, the court presided over a damages hearing to determine the amount of the damage award to be entered against the defendant, who again appeared pro se.

<u>Findings of Fact and Conclusions of Law</u>

Based on the documentary evidence and testimony presented at the damages hearing, the court makes the following findings of fact and conclusions of law:

1.      The defendant's testimony lacked credibility. Plaintiff's Exhibit 4-19 highlights some of the inconsistencies in the defendant's presentation.  The exhibit is the defendant's application for life insurance, filled out in December 1993, on which the defendant lists his occupation as "manufacture advisor," his duties as "oversee[ing] production & manufacturing," the nature of his business as "manufacturing ski equipment," the length of his employment as one year, and the name of his employer as Unique Ski, Inc. ("Unique Ski"), a competitor of the plaintiff.  The defendant also listed additional employment with Siebenell as a consultant.  Under oath, the defendant stated that he had only infrequent and informal contact with Unique Ski during this period and was not an employee. However, the defendant admitted that Unique Ski was located next door to his residence, that his wife worked for Unique Ski, and that Unique Ski's telephone rang in his residence. The defendant additionally admitted that he had more extensive contacts with Unique Consulting, which was also located next door to his residence and was owned by the same principal as Unique Ski.  Those contacts included signatory powers on Unique Consulting's corporate checking account during the period in question.  He could offer no explanation for entries in Unique's books listing a credit to "H. Heubach" of $4,000 per month as "deferred salary" for

the period from October 1992 through July 1993. <u>See</u> Plaintiff's Exhibit 4-20. The defendant further testified that he had lied on this insurance application with the blessing of Unique's principal, a friend doing him a favor, because a preexisting medical condition made it difficult for him to obtain coverage.

2.      On several occasions before deciding to terminate the venture, Ellerhorst expressed concern about the apparent lack of progress and sought information from the defendant as to the cause and expected duration of the delays. At all times before Ellerhorst's decision to terminate the venture, the defendant assured Ellerhorst that he had made and was continuing to make his best efforts to prepare the Lawrenceburg facility for production and that the facility would be able to commence production in short order. Ellerhorst's reliance on the defendant's representations was reasonable during the initial delays. When he discovered that the defendant was in fact not using his best efforts on behalf of the plaintiff but was actually working for a competitor, a material breach of the contract, it was reasonable for Ellerhorst to terminate the venture.

3.      The plaintiff waived voluntarily any claim it has to lost profits. Accordingly, the plaintiff is entitled to recover those out-of-pocket expenditures that it made in reasonable reliance on the failed venture, less "deductions for any benefit received through salvage or otherwise."[4] <u>DPJ Co. Ltd. Partnership v. FDIC</u>, 30 F.3d 247, 249 (1st Cir. 1994) (quoting Farnsworth, <u>Contracts</u> § 12.16 at 928 (2d ed. 1990)).

4.   <u>Expenditures to or on Behalf of the Defendant</u>: The plaintiff paid $53,129.32 in salary and employment taxes to or on behalf of the defendant. The plaintiff expended $3,960.00 to obtain an apartment for the defendant near the Lawrenceburg facility where he was supposed to relocate. Both expenses represent funds spent in reliance on the defendant performing his duties under the contract. Thus, the plaintiff may recover $57,089.32 for these expenses.

---

[4]To the extent that the plaintiff also seeks restitutionary damages, these are duplicative of its recovery of damages based on reliance.

5.  <u>Equipment Expenditures</u>:  The plaintiff paid $156,920.35 directly to the defendant for equipment purchases and other business-related purposes.  The plaintiff also made payments to the following vendors for equipment to be used in its operation: $94,260.00 to vendor G & G; $8,836.80 to vendor Grant Machine; $22,243.86 to vendor Ski Tuner; $17,177.92 to vendor Curtain Coater; and, $32,937.80 to other vendors.  These expenditures for equipment total $332,376.73.  The plaintiff sold its equipment for $178,666.50.  The defendant is entitled to deduct this amount from the total damages assessed against him.  Thus, the plaintiff may recovery $153,710.23 in damages arising from equipment-related costs.

6.  <u>Lawrenceburg Facility Expenditures</u>:  The plaintiff expended $143,754.02 to rent and equip a production facility in Lawrenceburg.  Upon deciding that the best course was to cut its losses, the plaintiff sought a release from its uncompleted three-year lease term.  The landlord released the plaintiff from the lease in exchange for the plaintiff's promise to leave on the premises all leasehold improvements made during the lease term.  In seeking and obtaining such a release the plaintiff took a reasonable step to mitigate the damages in this action.  Thus, the plaintiff may recover $143,754.02 for these expenditures.

7.  <u>Pre-Operational and Operational Expenses</u>:  Ellerhorst expended $6,841.92 on travel in an effort to secure business for the plaintiff for which the plaintiff reimbursed him.  The plaintiff expended $8,666.03 in interest to service the debt it incurred to finance the venture; $9,361.98 in freight charges for shipment of materials; and $2,276.86 in customs and duty charges.  All of these expenditures were made in reasonable reliance on the contract.  Thus, the plaintiff may recover $27,146.79 for these expenses.

The plaintiff also expended $42,330.40 to purchase materials for its operation.  Although the plaintiff proved that it incurred these expenses, it did not introduce evidence indicating that it sold or attempted to sell these materials to mitigate its damages.  The plaintiff is not entitled to recover the purchase price of materials that it keeps and through the retention of which it receives a benefit.  <u>See</u> <u>DPJ Co. Ltd. Partnership v. FDIC</u>, 30 F.3d 247, 249 (1st Cir. 1994).  Similarly, the plaintiff paid $6,530.89 to secure product liability insurance.  As the plaintiff never had a product to sell or even a working

production facility, the plaintiff failed to prove that the purchase of product liability insurance was justified under the circumstances. The plaintiff may not recover either of these expenses.

8. <u>Legal Expenses</u>: The plaintiff expended $3,594.25 on legal-related travel expenses in preparation of this action. The plaintiff may recover these expenses, but as part of its costs (awarded <u>infra</u>) rather than as an element of its damages.

The plaintiff paid $27,041.56 in legal fees in this action through December 31, 1995, for which it seeks recovery. The plaintiff only claims a specific entitlement to attorney's fees in its count for unfair trade practices (document no. 1, Attachment 1, at 14)(claiming that the defendant engaged in unfair trade practices by "soliciting plaintiff's customers and potential customers through misrepresentations"). However, the plaintiff did not prove that its attorney's fees arose from these alleged unfair trade practices.[5] Nor did it direct the court to any other statutory provision or other recognized basis that would entitle it to recover these fees. <u>See</u> <u>Wilko of Nashua, Inc. v. TAP Realty, Inc.</u>, 117 N.H. 843, 852, 379 A.2d 798, 804 (1977) (noting "New Hampshire's traditional rule limiting attorney's fees except as provided by statute or under certain special circumstances"). Thus, the plaintiff is not entitled to recover attorney's fees. <u>See</u> <u>id.</u>

9. At the hearing the court granted the pro se defendant considerable latitude in presenting evidence to controvert the plaintiff's evidence of damages, to show that the plaintiff failed to mitigate its damages, or to show that he was otherwise entitled to an offset of damages because he

---

[5]Because the plaintiff acknowledged at the hearing that it never began production and, in fact, waived any claims it had to lost profits, it follows that none of the damages that it incurred can be attributed to the loss of its actual or potential customers. <u>Cf.</u> <u>Heritage Home Health, Inc. v. Capital Region Health Care Corp.</u>, No. 95-558-JD, slip op. at 10-11 (D.N.H. Oct. 1, 1996)(damages for intentional interference with contractual and prospective contractual relations not recoverable absent proof of "existing relationships that give rise to a 'reasonable expectation of economic advantage' [citation omitted]").

provided services or expended his own funds on the plaintiff's behalf. However, while the defendant vigorously contested the plaintiff's version of the merits of the case, he failed to introduce specific evidence to rebut the plaintiff's evidence or to prove his counterclaims. Although the defendant alleged in a conclusory fashion that he spent not only the money given to him by the plaintiff but also his personal funds in an effort to get the manufacturing operation functional, he failed to produce any evidence as to how much money he expended. The court finds that the defendant is entitled to no offset to the damages award for these vague, unsubstantiated claims.

10. <u>Total Recovery</u>: The court finds that the plaintiff is entitled to recover $381,700.36 from the defendant. This figure represents the sum of losses that the plaintiff proved that it suffered because of the defendant's conduct, offset by any benefits received by the plaintiff.

<u>Summary</u>

The clerk shall enter judgment in the plaintiff's favor in the amount of $381,700.36. Costs are awarded to the plaintiff. The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

December 4, 1996

cc:  David W. Hess, Esquire
     Horst Heubach, pro se

11