**SERVO KINETICS, INC., Plaintiff,**

v.

**TOKYO PRECISION INSTRUMENTS COMPANY LIMITED, and Moog, Inc., Defendants.**

**No. 03–73360.**

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 28, 2004.

Sonal H. Mithani, Hideaki Sano, Miller, Canfield, Allyn D. Kantor, Ann Arbor, MI, for Plaintiff.

Edward H. Pappas, Dickinson Wright, Bloomfield Hills, MI, Brian M. Akkashian, Dickinson Wright, Detroit, MI, for Defendants.

**MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR FORUM NON CONVENIENS AND TO QUASH SERVICE**

COHN, District Judge.

### I. Introduction

This is a commercial dispute. Plaintiff Servo Kinetics, Inc. (SKI) is suing defendants Tokyo Precision Instruments (TSS) and Moog, Inc. (Moog) claiming (1) breach of contract against TSS, (2) breach of contract against Moog, (3) tortious interference with contractual relations against Moog, and (4) violation of Michigan's trade secret act against TSS and Moog. SKI essentially claims that TSS terminated its business relationship with SKI at the behest of Moog, who acquired TSS, because Moog did not want to do business with SKI.

TSS and Moog removed the case to federal court based on diversity jurisdiction.

Before the Court is TSS and Moog's motion to dismiss for forum non conveniens and to quash service on TSS. For the reasons that follow, the motion is DENIED.

### II. Background

The material facts as gleaned from the parties' papers follow:

#### A.

TSS is a Japanese manufacturer in Japan of servo valves which are used in a variety of hydraulic-operated machines. SKI repairs and rebuilds hydraulic equipment and also re-manufactures servo valves and distributes new servo valves to end users. It is a small company with a staff of ten.

Moog is a New York corporation which has several subsidiaries. Moog is, according it its website, "a worldwide manufacturer of precision control components and systems." *www.Moog.com.* It manufactures, among other things, servo valves.

TSS and SKI had almost a fifteen year business relationship in which SKI distributed servo valves manufactured by TSS, apparently in the United States. SKI says that throughout their relationship, all correspondence has been in English and that while no SKI employees can read or speak Japanese, many TSS employees can read and speak English.

In 1997, CAE, a Canadian company, approached SKI and TSS regarding the possibility of purchasing TSS's servo valves through SKI. At the time, CAE purchased servo valves from Moog. CAE sought out TSS as a second supplier. CAE is a leading producer of flight simulators, which also use servo valves. SKI and TSS entered into non-disclosure agreements with CAE in February 1999 and September 2000, respectively. The non-disclosure agreements protected the duplication and dissemination of confidential and proprietary information provided by the parties in connection with the supply of servo valves to CAE.

SKI and TSS, working together, won 50% of CAE's servo valve business in 2001.

In January 2002, SKI and TSS entered into a five-year distributor agreement under which SKI became TSS's exclusive North American distributor of servo valves. The distributor agreement provides that all disputes will be governed by Japanese law and that the Japanese language version of the agreement is controlling. It also provides that it is terminable by either party on six months notice "provided however, such right of termination of each party shall not be exercised without good reason." As a result of distributor agreement, SKI entered into a three-year supply contract with CAE, which was set to begin on April 1, 2002.

On March 29, 2002, three days before the SKI/CAE contract was to begin, Moog Japan Co. Ltd. (Moog Japan), a Japanese corporation, purchased a majority of TSS's shares. All of Moog Japan's shares are owned by Moog. Moog Japan is not a named defendant.

On April 8, 2002, TSS sent a letter to SKI exercising its option to terminate the distributor agreement on six months notice, for the following reason:

> The [TSS]/SKI Exclusive Distributor Agreement dated January 1, 2002 would place in serious conflict and disarray the product distribution arrangements around the world of TSS and Moog and all Moog subsidiaries, including Moog–Japan.
>
> We would however welcome your interest in establishing communication with Moog's Industrial Controls Division in the USA with a view to exploring mutually agreeable opportunities to work together in the future.

The letter is in English and signed by a Sean Gartland, whom Moog apparently appointed as a representative of TSS.

On April 25, 2002, SKI representatives met with representatives of Moog, Martin Birardi and Paul Elwell, Jr. (apparently from Moog's New York office) to discuss the distributor agreement and SKI's ongoing relationship with TSS. SKI learned at the meeting that Moog intended to terminate the distributor agreement, that Moog had been planning to acquire TSS for many month, and that TSS's "simulator" servo valve line (used by CAE) would be moved to Moog's facility in New York in the event that TSS went out of business and other servo valve business from TSS would be moved to other Moog locations throughout the world.

At some point, a pro-forma business cooperation agreement between Moog and SKI was prepared. It provides that Moog would offer SKI "non-exclusive access to Moog products for sale to Flight Simulation OEM customers throughout North America" with the exception of CAE and another company. The agreement was not executed.

At some point later in 2002, TSS closed its production facilities due to financial difficulties. A page from TSS's website says that it "has closed on 30th Sept. 2002 and moved all the business into MOOG Japan." Defendants says that TSS still exists as a corporate entity, although the extent to which is not clear.

By January 2003, Moog had taken all of TSS's product lines off the market in North America and contacted SKI's customers to inform then that SKI was no longer an authorized distributor of TSS products. Interestingly, the letters Moog sent to SKI customers are on Moog's New York's office letterhead.

SKI says that as a result of TSS/Moog's actions, it has lost servo valve business from customers ready to purchase servo valves made by TSS, in excess of $100,000.00. SKI says that Moog's actions has forced CAE and other customers to obtain servo valves from Moog or other companies instead of SKI.

On August 4, 2003, SKI sued TSS and Moog in Washtenaw County Circuit Court, making claims for breach of contract against both TSS and Moog, tortious interference against Moog, and violation of Michigan's Trade Secrets Act, M.C.L.A. § 445.1901. The state court judge allowed alternative service on TSS by service on Moog. Moog accepted service but retained the right to object.

On September 4, 2003, defendants removed the case on the grounds of diversity jurisdiction (SKI is a Michigan corporation, Moog is a New York corporation, and TSS is a Japanese corporation).

In lieu of an answer, on October 7, 2003, defendants filed the instant motion to dismiss on the grounds of forum non conveniens and to quash service against TSS.

### III. Motion to Dismiss Based on Forum Non Conveniens

#### A. In General

■ Under the common law doctrine of forum non conveniens, a district court "may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum." *Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944, 945 (1st Cir.1991). The doctrine is a flexible one, requiring the court to weigh multiple factors relating to fairness and convenience based on the particular facts of the case. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249–50, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

■ A defendant moving for dismissal on forum non conveniens grounds must first demonstrate the availability of an adequate alternative forum. *See Stewart*, 865 F.2d at 106; *Kryvicky v. Scandinavian Airlines Sys.*, 807 F.2d 514, 516 (6th Cir.1986); *Dowling v. Richardson–Merrell, Inc.*, 727 F.2d 608, 612 (6th Cir.1984). This requirement is normally satisfied when the defendant is "amenable to process" in the foreign jurisdiction. *See Piper Aircraft Co.*, 454 U.S. at 254 n. 22, 102 S.Ct. 252 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506–07, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). "In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied." *Id.* However, general allegations of corruption or bias on the part of the foreign forum will not prevent a dismissal on forum non conveniens grounds. *See, e.g., El–Fadl v.*

*Central Bank of Jordan*, 75 F.3d 668, 678 (D.C.Cir.1996) (State Department report expressing "concern about the impartiality" of Jordanian courts did not suffice to make that forum inadequate). Nor will political unrest in a foreign jurisdiction render the forum inadequate absent some showing that the unrest has had an adverse effect on the judicial system there.

■ Once the court has decided that an adequate alternative forum is available, it must proceed to balance the public and private interests to determine whether the convenience of the parties and the ends of justice would be served by dismissing the action. *See Stewart*, 865 F.2d at 106–07; *Kryvicky*, 807 F.2d at 516; *Dowling*, 727 F.2d at 612. Among the important private interests that a court must consider are: the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of unwilling witnesses; the possibility of viewing the premises, if view of the premises would be appropriate to the action; and, any problems associated with enforcing a judgment, if one is obtained. *See Dowling*, 727 F.2d at 612 (quoting *Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839, 91 L.Ed. 1055). Relevant public interest factors include: the administrative burden of proceeding in courts with congested dockets; the burden of imposing jury duty on people of a community having no connection with the litigation; the desirability of holding a trial nearest to those affected most by it; and, the appropriateness of holding a trial in a diversity case in a court familiar with the governing law. *See id.*

In applying this analysis, the Supreme Court has noted that "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial

in the alternative forum.... [H]owever, ... the presumption applies with less force when the plaintiff or real parties in interest are foreign." *Piper Aircraft Co.*, 454 U.S. at 255, 102 S.Ct. 252 (emphasis added).

## B. Analysis

### 1. Parties' Arguments

Defendants say that their motion is premised "on the tremendous difficulties that would face this Court, and the parties, in applying the law of Japan to this dispute."[1] This is so because they argue that Japanese law governs all of SKI's claims and applying Japanese law, particularly whether TSS had "good reason" to terminate the distributor agreement as that term is understood in Japanese law, would be virtually impossible for the Court. They also say that many non-party witnesses reside in Japan, as do the majority of defense witnesses. Defendants further argue that Japan has an interest in this dispute because TSS and Moog Japan (not a named defendant) are Japanese companies.

SKI argues that "this is a case between two United States Companies." Although defendants claim that Moog Japan, not Moog, directed the acquisition of TSS, "Moog's own documents show that Moog directed the acquisition of [TSS]" from its headquarters in New York. Because Moog controls Moog Japan and because SKI's essential claim is that Moog directed TSS to terminate the distributor agreement, this case is really SKI versus Moog. SKI also says that the key witnesses regarding Moog's conduct are in New York and elsewhere in North American (other SKI customers, including CAE). They also note that correspondence between SKI and TSS was in English and any Japanese documents can be easily translated. SKI

further argues that the application of Japanese law does not require dismissal because Japanese law "need only apply to a small portion of this case"—whether TSS had "good reason" to terminate the distributor agreement. While SKI understood it was doing business with a Japanese company, SKI should not be expected to have anticipated that a New York company would take over that Japanese company and force the breach of the distributor agreement and then argue that Japanese law governs its conduct. Moog has no legitimate expectation Japanese law would govern SKI's claims—Moog should account for its conduct under United States law in a United States forum.

### 2. Conclusion

#### a. Adequate Alternative Forum

Defendants have not specifically addressed this requirement, besides to says that Moog would stipulate to the jurisdiction of the Japanese courts. SKI has not argued that Japan would be an inadequate alternative forum. This factor does not weigh in either party's favor.

#### b. Public Interest Factors

Again, relevant public interest factors include

1. the administrative burden of proceeding in courts with congested dockets;

2. the burden of imposing jury duty on people of a community having no connection with the litigation;

3. the desirability of holding a trial nearest to those affected most by it; and,

4. the appropriateness of holding a trial in a diversity case in a court familiar with the governing law.

---

1. As evidence, defendants have attached affidavits from Japanese attorneys who state, among other things, that there are no official translations of Japanese statutory law.

Defendants have not presented much argument as to these factors, other than to say because Japanese law governs the dispute, Japan has a greater interest in the dispute. Defendants spend a good deal of time explaining how Michigan's choice of law rules require that Japanese law apply to all of SKI's claim. SKI, on the other hand, says that Michigan has a greater interest in protecting its corporations from improper acts that interfere with its opportunity to do business. They also argue that Japanese law should not apply to all of their claims.

■ SKI's position is well taken. The Court is not concerned by the fact that Japanese law may govern some, or even all, of SKI's claims. The issue of what law applies is for another day. The need to apply foreign law alone does not warrant dismissal. *See Piper Aircraft*, 454 U.S. at 235, 102 S.Ct. 252. Moreover, there are procedures for determining the law of foreign countries in federal courts. *See* 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Fed. Evid. § 201.52[3][b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1997).

### c. Private Interest Factors

As noted above, these factors include:
1. the relative ease of access to sources of proof;
2. the availability of compulsory process for attendance of unwilling witnesses;
3. the cost of obtaining attendance of unwilling witnesses;
4. the possibility of viewing the premises, if view of the premises would be appropriate to the action; and,
5. Any Problems Associated With Enforcing A Judgment, If One Is Obtained.

■ According to SKI, the key witnesses with information about Moog's conduct are its executives in New York and SKI's executives in Michigan. The documents relating to Moog's termination of the distributor agreement, decision to purchase TSS are located in New York. Defendants, however, say that witnesses and documents are in Japan and it is "not clear" whether some witnesses will be willing to cooperate. Overall, defendants have not established that any inconvenience to them is out of proportion to SKI's convenience.

Moreover, defendants spend a good deal of time arguing that a judgment in this court would not be enforceable in Japan. SKI says that enforcement in Japan will not be necessary because its claims against Moog are the heart of its case. Because Moog controls TSS, a judgment against TSS would be enforceable in the United States.

The private factors do not weigh in favor of dismissal or trump SKI's selected forum. Essential to this finding is the understanding of the nature of SKI's claims as being against Moog, not TSS. While Moog says that Moog Japan, its subsidiary, actually purchased TSS, Moog is a named defendant; Moog Japan is not. Moreover, the record shows that it was Moog, not Moog Japan, that communicated with SKI regarding the termination of the distributor agreement and the possibility of a future business relationship. Since TSS is virtually non-existent (and presumably non-collectible), this case is really against Moog; Moog must defend against its actions relative to the distributor agreement. Defendants' motion essentially rests on the assertion that dismissal is warranted because Japanese law may govern this dispute inasmuch as they acknowledge that there is "perhaps a close question on matters of convenience." Clearly, a close question of convenience does not

weigh in favor of disturbing SKI's chosen forum.

### IV. Motion to Quash Service

As to defendants' argument to quash service of TSS, having reviewed the parties' arguments, the Court finds the state court's order of alternative service is appropriate. Service on the CEO of Moog was sufficient service on TSS.

SO ORDERED.